IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 14, 2018 Session

**IN RE ADDALYNE S.**

**Appeal from the Chancery Court for Coffee County**
**No. 2015-CV-333    L. Craig Johnson, Judge**

_____

**No. M2017-00958-COA-R3-PT**

_____

In this parental termination case, maternal Grandparents sought termination of both Mother's and Father's rights on the grounds of: (1) abandonment by willful failure to support and (2) abandonment by willful failure to visit. The trial court found no grounds for termination as to Mother and only one ground—failure to support—as to Father. The trial court however found that it was not in the child's best interest to terminate Father's rights. We affirm the trial court's judgment in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which FRANK G. CLEMENT, P.J., M.S., and W. NEAL MCBRAYER, J., joined.

Christopher R. Stanford, Manchester, Tennessee, for the appellants, Anthony O. and Bethany O.

Stacy L. Lynch, Tullahoma, Tennessee, for the appellee, Katheryn O.

Thompson G. Kirkpatrick, Manchester, Tennessee, for the appellee, John S.

**OPINION**

FACTS

Addalyne S. ("Addy" or "the child") was born in February 2013 to unmarried parents John S. ("Father") and Kathryn O. ("Mother") (together with Father, "Parents").[1]

_____

[1] In cases involving termination of parental rights, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.

Mother and Father engaged in a long-term, tumultuous relationship that included abundant drug abuse and criminal charges for both. After Addy was born, she and Mother resided with Mother's parents, Anthony and Bethany O. ("Grandparents"), for a short time because Mother needed assistance with Addy's care. Shortly thereafter, Mother moved out of Grandparents' home, leaving Addy to be cared for by Grandparents. Addy continues to reside with Grandparents, who support Addy financially and provide her with a stable and loving home.

Grandparents filed a dependency and neglect petition on March 21, 2014, in the Coffee County Juvenile Court ("juvenile court"). The petition detailed Father's multiple failures in providing for and raising Addy and Mother's agreement that Grandparents should be temporary legal guardians of Addy due to both Mother's and Father's inability to provide for Addy's needs. The parties participated in mediation, and on November 13, 2014, Grandparents obtained temporary custody of Addy through an agreed order. The order granted Grandparents legal and physical custody of Addy and outlined different steps Mother and Father must complete to regain custody of the child. These steps included hair follicle drug screening, urine drug screens, and rehabilitation meetings. Upon completion of each step, Mother and Father could increase their visitation time with Addy, with the opportunity to eventually regain full custody.

Mother and Father continued to exercise their visitation with Addy after the agreed order was entered. Visitation was, however, essentially the extent of their compliance with the order. Mother and Father both took only one hair follicle drug screen as the court ordered, and both parents failed their hair follicle test by testing positive for an assortment of different substances. After failing their respective drug tests, Parents did not take any urine tests or attend rehabilitation meetings pursuant to the agreed order. Parents took additional drug tests after the petition for termination was filed, which is discussed in more detail, *infra.* Mother and Father have both struggled with drug addiction throughout Addy's life. Eventually, their drug abuse resulted in criminal charges. Father has been convicted of drug possession and driving under the influence. Mother has also been convicted of driving under the influence. Mother and Father were also arrested together in 2015 for drug possession and possession of drug paraphernalia.

In January 2015, Grandfather initiated a child support action through the State of Tennessee seeking support from Mother. On February 4, 2015, however, Grandfather voluntarily dismissed the pending child support action due to Mother's medical issues, which prevented her from working.[2] The order stated that the matter was "dismissed due

---

[2] In late 2014 into early 2015, Mother had two serious surgeries for thoracic outlet syndrome, which rendered her unable to work and provide support for Addy. Thoracic Outlet Syndrome is "an abnormal type of mononeuropathy characterized by paresthesia. It may be caused by a nerve root compression by a cervical disk." *Mosby's Dictionary of Medicine, Nursing, and Health* Professionals 1767 (9th ed. 2013). Paresthesia is "any subjective sensation, experienced as numbness, tingling, or a 'pins and needles' feeling." *Id.* at 1336.

to [Grandfather] no longer wanting to pursue child support from [Mother]." On April 22, 2015, Grandparents initiated a second child support case using a private attorney. Grandparents' attorney personally served both Mother and Father with summonses to the juvenile court while Mother and Father were at the Coffee County Justice Center facing criminal charges.[3] The summonses specified that the hearing regarding child support would occur on June 1, 2015.

Neither Mother nor Father appeared for the child support hearing. The juvenile court entered a default judgment against Mother and Father on June 17, 2015, ordering each parent to pay $308.00 in support per month. The June 17 judgement was mailed to Mother and Father at Mother's paternal grandmother's home. It is disputed as to whether Grandparents believed this was where Mother was actually residing. Mother claims that she did not receive the default order at that time, and was unaware of the order requiring her to pay the monthly child support until after the termination petition was filed. Father also claims he was unaware of the order. Both parents later testified, however, that they were aware of their duty to financially support Addy. Father paid $20.00 per week of support in July 2015, totaling $80.00. Mother paid no support prior to the filing of the termination petition, but provided Addy with doughnuts, an outfit, and tomatoes. Mother paid a total of $95.00 in support after the petition was filed.

Despite Parents' ongoing drug abuse problems to this point, both were able to secure employment prior to the filing of the termination petition. Father worked in construction, and testified that he made approximately $100.00 per day. Mother was unable to work from late 2014 into early 2015 due to major surgeries. Mother resumed work in October 2015 at Aspen Technologies Inc. ("Aspen Technologies"), a factory located in Manchester, Tennessee. Mother, however, only worked at Aspen Technologies for approximately three weeks, ending her employment in early November 2015. According to Mother, her issues with maintaining employment related to her inability to secure reliable transportation.

On December 11, 2015, Grandparents filed a petition to terminate both Mother's and Father's parental rights in the Coffee County Chancery Court ("trial court"). Grandparents relied on three separate grounds in their petition: (1) abandonment by willful failure to support, (2) abandonment by willful failure to visit, and (3) persistence of conditions.[4] A trial was conducted on March 21, March 24, and March 30, 2017.

---

[3] It is unclear from the record whether the petition to set child support was actually attached to Mother's summons.

[4] Grandparents withdrew the ground of persistence of conditions because there was no finding of dependency, neglect, or abuse. *See In re Audrey S.*, 182 S.W.3d 838, 867–68 (Tenn. Ct. App. 2005) (holding that the ground of persistent conditions can only apply when the children were removed from parents home based on a judicial finding of dependence, neglect, and abuse).

At trial, Mother testified candidly about her struggle with drug addiction. She also testified that she had not used any drugs for almost one year, and passed multiple drug tests. Mother also stated that she had a steady job at Speedway Market in Tullahoma, Tennessee, and was expecting a promotion. Mother testified that, at the time of trial, she had a stable home and had been living with her boyfriend since the summer of 2016. She also stated that she has consistently visited Addy, who calls her "Mommy," once a week.

Regarding Mother's visitation with Addy, Grandparents testified that Mother visited only a minimal amount of times from August to December 2015, including missing over fifteen visits from November 2015 to February 2016. Grandparents introduced Grandmother's written log of Mother's visits into the record, which detailed each of Mother's visits. These logs detailed only six visits in the period relevant to this appeal, as discussed, *infra*.[5] Grandparents also stated that during Mother's visits with Addy she was often disengaged, smoking, playing on her phone, or under the influence of illegal drugs. Grandparents noted that Mother usually did not stay the full six hours allotted to her for her visits. Mother, however, testified that she visited Addy more than the dates logged by Grandmother and that she was engaged during the visitation. Mother testified that her failure to attend every visitation with Addy resulted from a combination of unreliable transportation and disagreements with Grandparents. Mother described her visits with Addy as "great" and that the two enjoyed doing activities, such as going swimming and doing hair and make-up together.

Father also testified at trial. He, too, was candid about his drug abuse problems. Father explained that he was incarcerated from September 29, 2015, to December 1, 2015, apparently as the result of a probation violation stemming from previous drug convictions. Father stated that he has not had any more arrests or drug charges since the beginning of 2016. From Father's testimony, it appears that he has taken three drug screens since the petition was filed, one on August 19, 2016, which tested positive for THC (marijuana) only; one in December 2016, which tested positive for methamphetamine, amphetamine, and marijuana; and the third on the day of the trial, when he tested negative for all substances. Following his December 2016 drug test, Father testified that he participated in and completed a three-week rehabilitation program at Mirror Lake Recovery Center in early 2017.

Like Mother, Father stated that he also was living with his significant other and her six year old son in a stable, drug-free household. There was also no dispute that Father held a stable job. Furthermore, Father stated that he has not missed one visitation with Addy in 2016. He also testified that Addy has a strong bond with Father's niece, Bella, along with Father's mother and sisters. Father's visitations also generally take place on his mother's twenty-five acre farm, where Addy has a horse named August with

---

[5] These six visits occurred August 19, 2015; August 26, 2015; September 2, 2015; September 16, 2015; September 23, 2015; and November 4, 2015.

whom she also has a strong bond. Father testified that Addy is comfortable with him during their visitations and she also calls him "Daddy" when they are together.

On April 25, 2017, the trial court issued its findings of facts and conclusions of law, finding that Grandparents failed to present clear and convincing evidence as to any ground to terminate Mother's parental rights. The trial court found that Grandparents did establish by clear and convincing evidence that Father willfully failed to support his child. The trial court further concluded that it was not in Addy's best interest to terminate Father's rights, in large part due to the guardian ad litem's recommendation against termination of Father's parental rights if Mother's rights were not terminated. The trial court entered its final order denying termination and remanded the matter to juvenile court for any further custody issues on May 9, 2017. From this order, Grandparents timely appealed on May 10, 2017.

ISSUES

Grandparents present four issues on appeal, which we have taken from their appellate brief, as follows:

1. Whether the trial court erred in finding that the Mother did not willfully fail to pay child support during the relevant four-month period,
2. Whether the trial court erred in finding that the Mother did not willfully fail to visit the child during the relevant four-month period.
3. Whether the trial court erred in finding the child's best interest were not served by terminating the Mother's parental rights.
4. Whether the trial court erred in finding the child's best interest were not served by terminating the Father's parental rights.

Father presents an additional issue, which we have taken, and slightly restated, from his brief: Whether the trial court erred in determining that the Grandparents proved by clear and convincing evidence that Father willfully failed to pay support during the relevant four-month period.

STANDARD OF REVIEW

The Tennessee Supreme Court has explained that:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896

- 5 -

S.W.2d 546, 547–48 (Tenn. 1995); **Hawk v. Hawk**, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. **In re Angela E.**, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors. . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." **Hawk**, 855 S.W.2d at 580 (quoting **In re Hamilton**, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also* **Santosky v. Kramer**, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); **In re Angela E.**, 303 S.W.3d at 250.

**In re Carrington H.**, 483 S.W.3d 507, 522–23 (Tenn. 2016) (footnote omitted). In Tennessee, termination of parental rights is governed by statute which identifies "'situations in which that state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" **In re Jacobe M.J.**, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting **In re W.B.**, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618 at *7 (Tenn. Ct. App. Apr. 29. 2005) (citing Tenn. Code Ann. § 36-1-113(g)). Thus, a party seeking to terminate a parent's rights must prove (1) existence of one of the statutory grounds and (2) that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); **In re D.L.B.**, 118 S.W.3d 360, 367 (Tenn. 2003); **In re Valentine**, 79 S.W.3d 539, 546 (Tenn. 2002).

Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases. **Santosky**, 455 U.S. at 769. As such, a party must prove statutory grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c); **In re Valentine**, 79 S.W. 3d at 546. Clear and convincing evidence "establishes that that truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence[,]" and "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." **In re M.J.B.**, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In termination cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); **In re Carrington H.**, 483 S.W at 523–24 (citing **In re Bernard T.**, 319 S.W.3d 586, 596 (Tenn. 2010); **In re M.L.P.**, 281 S.W.3d 387, 393 (Tenn. 2009); **In re Adoption of A.M.H.**, 215 S.W.3d 793, 809 (Tenn. 2007)). Our supreme court further explains:

The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de

novo with no presumption of correctness. ***In re M.L.P.***, 281 S.W.3d at 393 (quoting ***In re Adoption of A.M.H.,*** 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. ***In re Angela E.,*** 303 S.W.3d at 246.

***In re Carrington H.***, 483 S.W at 524.

Lastly, in the event that the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." ***In re Navada N.***, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing ***McCaleb v. Saturn Corp.***, 910 S.W.2d 412, 415 (Tenn. 1995); ***Whitaker v. Whitaker***, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). This Court therefore "gives great weight to the credibility accorded to a particular witness by the trial court." ***In re Christopher J.***, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing ***Whitaker***, 957 S.W.2d at 837).

ANALYSIS

Grounds for Termination

*Abandonment Generally*

Abandonment is a statutory ground for termination of parental rights. Tenn. Code Ann. § 36-1-113(g)(1). Tennessee Code Annotated section 36-1-102 defines "abandonment," in relevant part, as

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or a guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or a guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

\*\*\*

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the

- 7 -

parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. §36-1-102(1)(A)(i)–(iv). A central inquiry a court must make when determining whether a parent abandoned his or her child pursuant to section 36-1-102(1)(A) is whether the abandonment was willful. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i) & (iv). This Court has explained the concept of willfulness in parental termination cases:

The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months.

In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.

Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty[] or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child[.] The parental duty of visitation is separate and distinct from the parental duty of support. Thus, attempts by others to frustrate or impede a parent's visitation do not provide justification for the parent's failure to support the child financially.

The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations.

Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*In re Audrey S.*, 182 S.W.3d 838, 863−64 (Tenn. Ct. App. 2005) (internal citations and footnotes omitted). "'Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law.'" *In re Navada*, 498 S.W.3d at 593 (quoting *In re Adoption of Angela E.*, 182 S.W.3d at 640). We next turn to the specific grounds of abandonment alleged against Mother and Father in this case.

Grandparents appeal the trial court's finding that Grandparents failed to prove by clear and convincing evidence that Mother (1) willfully failed to support and (2) willfully failed to visit to Addy pursuant to Tennessee Code Annotated section 36-1-102(1)(A). Father has also appealed the trial court's finding that he willfully failed to support Addy pursuant to Tennessee Code Annotated section 36-1-102(1)(A).[6] As such, we will discuss the grounds appealed by each party in turn.

*Abandonment by Willful Failure to Visit*

We begin with abandonment by willful failure to visit as alleged against Mother.[7] Tennessee Code Annotated section 36-1-102 defines willful failure to visit as "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation[.]" Tenn. Code Ann.§ 36-1-102(E) "Token visitation" means that "under the circumstances of the individual case, [there is] nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(C). As to this ground, the trial court found that

> [r]egarding the Mother, there were approximately twenty-two (22) potential weekend visits that could have occurred during this time pursuant to the Juvenile Court Visitation Order. The proof at trial showed that she visited at least eight (8) times during the four (4) months preceding the filing of the

---

[6] The Court of Appeals is required to review "the trial court's *findings* as to *each ground for termination* and as to whether termination is in the child's best interests, regardless of whether *the parent* challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525−26 (emphasis added). Here, the trial court found in favor of Father on the ground of willful failure to visit. "The rule adopted in *Carrington* has never been construed to require this Court to also consider the grounds not sustained by the trial court" and not challenged on appeal by the petitioning non-parent. *In re Sydney B.*, 537 S.W.3d 452, 456 (Tenn. Ct. App. 2017), *perm. app. denied* (Tenn. Aug. 1, 2017). As such, this Court is not required to review this ground for termination.

[7] As previously discussed, Grandparents failed to appeal the trial court's finding the Grandparents failed to prove by clear and convincing evidence that Father willfully failed to visit Addy during the relevant four-month period. As such, we will discuss this ground only as to Mother.

Petition for Termination. It is clear that she visited enough that the child continued to know who she was, called her "Mom," and loved to do activities together when possible under her supervised visitation. The Court finds this visitation was enough to continue the bond between this Mother and her child. The Court finds that [Grandparents] have failed to prove this ground by clear and convincing evidence.

We also conclude that the Grandparents failed to prove this ground by clear and convincing evidence. The trial court found, and there is no dispute on appeal, that Mother exercised eight of twenty-two, or approximately 36% of, potential visits with Addy during the relevant time period. Further, Mother testified that Addy calls her "Mommy." Additionally, there is evidence that Mother and Addy like to do many activities together during Mother's visitation such as playing outside together or doing makeup and hair, and that they are affectionate towards one another during visits.

Mother's amount of visitation certainly borders on being token. Indeed, at least one Tennessee court has held that a mother who completed 37.5% of her potential visits during the relevant time period only engaged in token visitation. *See In re L.J.*, No. E2014-02042-COA-R3-PT, 2015 WL 5121111, at *4–*6 (Tenn. Ct. App. June 29, 2015). In *In re L.J.*, mother attended three of her eight, or 37.5% of her scheduled visits with her child. *Id*. at *4. The mother argued that attending 37.5% of visits amounts to more than token visitation, but the trial court disagreed. *Id.* In affirming the trial court's decision, the court considered a multitude of factors in determining whether the mother's visitation was, in fact, token. *Id.* at *4–*6. These factors included the quality of the visits, the relationship between the parent and child before the four-month period, the quantity of visits, and whether the visits were sufficient to create and maintain a bond between parent and child. *Id.* at *4–*5. Reviewing the evidence, the Court concluded that the mother's visits were generally of poor frequency and mediocre quality, that the mother and child had little relationship even prior to the four-month period; the court therefore likened the mother's situation to a case wherein a parent's perfunctory visits were insufficient to establish any meaningful relationship with the child. *Id.* at *4 (citing *State Dep't of Children's Services v. L.L.T.*, No. E2003-00501-COA-R3-JV, 2003 WL 23094559, at *4 (Tenn. Ct. App. Dec. 30, 2003) (noting that "absolutely no evidence that a meaningful relationship was ever established between [m]other and child.")). The Court additionally noted that when mother provided an excuse for missing visitation, she "attributed it to a lack of transportation and work conflicts." *Id.* at *5. The Court noted, however, evidence in the record to undermine mother's testimony on this issue, as child services workers testified that they assisted mother with transportation. *Id.* Under the totality of these circumstances, the corut held that the petitioners provided sufficient proof that mother's visitation was no more than token. *Id.* at *5–*6.

At first blush, the facts of *In re L.J.* appear to be analogous to the case-at-bar. Indeed, Mother attended a similar, but even lesser amount, of visitation over the relevant

time period, had problems with reliable transportation, and Mother and Addy's relationship was also built during her scheduled, supervised visits. Token visitation, however, is analyzed in regard to the "circumstances of the individual case." Tenn. Code Ann. § 36-1-102(1)(c). As such, this Court has never imposed a bright-line rule as to what percentage of visitation must be attended in order avoid categorization as token. *Compare* **In Re Jayden B.T.**, No. E2014-00715-COA-R3-PT, 2015 WL 3876573, at *8 (Tenn. Ct. App. June 23, 2015) (holding that petitioners failed to prove that visitation was token where the parent made only two visits in four months); **In re E.M.P.**, No. E2006-00446-COA-R3PT, 2006 WL 2191250, at *5 (Tenn. Ct. App. Aug. 3, 2006) (holding that given the "sparse record," petitioners failed to provide clear and convincing evidence that mother's single visit to the child in the four month period was token under the circumstances), *with* **In re Audrey S.**, 182 S.W.3d 838, 867 (Tenn. Ct. App. 2005) (holding that one or two visits in four months was "nothing more than token visitation"). **In re L.J.**, 2015 WL 5121111, at *4–*6 (holding that three visits in four months was no more than token visitation). Indeed, we have recognized that each termination of parental rights case requires "individualized decision making[,]" rather than the application of bright-line rules. **In re Audrey S.**, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005) ("Because of the gravity of their consequences, proceedings to terminate parental rights require individualized decision making.").

Although the percentage of visitation in this case is similar to **In re L.J.**, other facts lead us to reach a different conclusion in this case. Here, unlike the mother in **In re L.J.**, the trial court found that Mother was able to maintain a meaningful relationship with Addy through the somewhat meager visitation that she attended. This Court has previously considered whether a parent's visitation was sufficient to "establish a meaningful relationship or bond between [the parent] and the children" in determining whether visitation was token. **In re Kaylee F.**, No. M2012-00850-COA-R3PT, 2013 WL 1097791, at *3 (Tenn. Ct. App. Mar. 15, 2013). In this case, the trial court explicitly found that the visitation was sufficient to continue the bond with the child, and the evidence in the record does not preponderate against this finding. In reaching this result, it appears that the trial court generally credited Mother's testimony rather than the testimony of Grandparents regarding the quality of the visitation between Mother and the child. Findings based on credibility are afforded great weight by this Court. *See* **Estate of Walton v. Young**, 950 S.W.2d 956, 959 (Tenn. 1997).

Moreover, Mother consistently maintained at trial that she had problems obtaining reliable transportation. The same excuse was provided by the mother in **In re L.J.**; however, in that case, the court appeared to discredit her testimony by noting the countervailing proof in the record that DCS had provided the mother with transportation assistance. *See* **In re L.J.**, 2015 WL 5121111, at *5. In contrast, the trial court in this case appeared to credit Mother's testimony regarding her transportation woes, finding that Mother's failure to work during the period at issue was due to the lack of reliable transportation. Because of the great weight afforded to a credibility determination of a

particular witness by the trial court, *see **Estate of Walton***, 950 S.W.2d at 959, we accept the trial court's implicit finding that Mother's testimony regarding her lack of reliable transportation was credible and therefore provided a justifiable excuse for some of her missed visits.  Lastly, we are unable to determine Mother's relationship with Addy prior to the relevant four-month period because the record contains only vague statements regarding Mother's visitation before August 2015.  Accordingly, under these particular circumstances, Mother's visits were more than perfunctory and were frequent enough to establish more than minimum or insubstantial contact with Addy; thus, Mother's visitation does not meet the definition of token visitation under our termination statutes. *See* Tenn. Code Ann. § 36-1-102(C).  We therefore affirm the trial court's determination that Grandparents failed to provide clear and convincing evidence that Mother willfully failed to visit her child.

*Abandonment by Willful Failure to Support Generally*

In order to satisfy section 36-1-102, a party must prove that the parent has "willfully failed to support or ha[s] willfully failed to make reasonable payments toward the support of the child."  Tenn. Code Ann. § 36-1-102(A)(1)(i).  "Willful failure to support or to make reasonable payments toward support means 'the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child.'" ***In re Adoption of Angela E.***, 402 S.W.3d at 640 (quoting Tenn. Code Ann. § 36-1-102(1)(D)).  "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so."  ***In re Audrey S.***, 182 S.W.3d at 864 (citing ***In re M.J.B.***, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004)).  If a parent is financially unable to support a child, then the failure to support is not willful. ***Id.*** at 824 fn.33.  Token support, however, does not prevent a court from finding of willful failure to support. ***In re Adoption of Angela E.***, 402 S.W.3d at 641.  Token support is defined as support "under the circumstances of the individual case, is insignificant given the parents means[.]"  Tenn. Code Ann. § 36-1-102(B).

**Mother**

Next, we consider abandonment by willful failure to support as alleged against Mother. Under Tennessee Code Annotated section 36-1-102(1)(A)(i), courts must look to "the period of four (4) months immediately preceding the filing of a proceeding or pleading to terminate the parental rights" when analyzing whether a child was abandoned.  In this case, the petition for termination was filed on December 11, 2015; therefore, the relevant four-month period for reviewing Mother's conduct is August 11, 2015 to December 10, 2015.

It is undisputed that Mother did not provide any support for Addy until after the termination petition was filed, with the exception of some gifts during her visits within

the relevant four-month period. This Court is therefore tasked with determining whether Mother's failure to provide support from August 11, 2015, to December 10, 2015, was willful. As mentioned above, determining whether a parent's abandonment is willful is a question of law which we review de novo. ***In re Adoption of Angela E.***, 182 S.W.3d at 640 (citing ***In re Adoption of A.M.H.***, 215 S.W.3d at 810).

In its findings of fact and conclusions of law, the trial court made the following findings relevant to the alleged ground of Mother's abandonment by failure to support:

> [Mother] admits that she failed to pay child support during this time.
>
> * * *
>
> In her deposition on November 11, 2016, [Mother] admitted [she] did work at Aspen Technologies, Inc., for a portion of the relevant four (4)-month period and provided small amounts of purchased goods for her daughter during this time period. She has paid a small amount of support of approximately Ninety-Five dollars ($95.00) after the filing of the petition between November 11, 2016, and January 26, 2017. The Court was unable to determine if she was able to work the entire four (4)-month period. The Court finds that the [Grandparents] have failed to prove this ground by clear and convincing evidence because the Court is not convinced that the Mother was able to work the entire four (4)-month period . . . .

In this case, Mother repeatedly testified that she understood that she had a duty to support Addy,[8] although Mother did express some confusion regarding whether

---

[8] In her testimony, Mother testified that:

[Grandparents' Attorney]: And you understood that you had a duty to support [Addy] financially when she was born?
[Mother]: Yes.

Q: You understood that you had a duty to support her until she turns 18 and graduates high school, did you not?
A: Yes.
***
Q: Okay. Yet you knew you had a duty to support Addy since the day she was born?
A: Okay. Yes.
Q: Correct?
A: Correct.

***
[Mother's Attorney]: You stated that you knew that it was your responsibility to pay child support?
[Mother]: Yes.
Q: . . . Is that an understanding that you have come to recently?

- 13 -

Grandparents were seeking payments from her following the dismissal of the first child support petition. Regardless of this dispute, we conclude that the record lacks clear and convincing evidence that Mother had the capacity to pay support during the relevant time period.

The evidence concerning this issue is limited at best. It is undisputed that Mother was employed at Aspen Technologies for a portion of the four-month period. Mother however testified that she only worked at Aspen Technologies for "about three weeks or so." Mother's testimony revealed, however, that the lack of reliable transportation made it difficult for her to maintain employment, which affected her ability to pay child support. The trial court declined to discredit Mother's testimony on this issue, and Grandparents offered no countervailing proof to show that Mother worked longer than three weeks or that the termination of her employment was based on anything other than her lack of transportation. Accordingly, from August 10 to December 10, 2015, Mother was employed for less than one-quarter of the relevant period.

It is also undisputed that Mother was paid for her work at Aspen Technologies; however, the record is completely devoid of evidence regarding the number of hours Mother worked per week, her hourly pay, or the expenses Mother incurred during this time. Indeed, the only evidence included in the record regarding the wages earned by Mother at Aspen Technologies is that Mother was able to purchase items such as clothing, food, personal hygiene products, i.e. soap and shampoo, and drugs. Mother's decision to purchase drugs during the relevant time period is a grave concern for this Court and indicates that Mother did have some funds for non-necessities. However, the purchase of illegal drugs alone is insufficient to prove that Mother's failure to provide support was willful. *See In re Kira G.*, No. 2016-01198-COA-R3-PT, 2017 WL 1395521, at *6 (Tenn. Ct. App. April 18, 2017) ("Although illegal drug abuse and the purchase or sale of illegal drugs may well be relevant to determining whether a parent willfully has failed to support his or her child while supporting his or her drug use, illegal drug activity by itself does not establish willfulness.")) (quoting *In re Karissa V.*, No. E2016-00395-COA-R3-PT, 2017 WL 758513, at *11 (Tenn. Ct. App. Feb. 27, 2017). Further, Mother testified that she provided Addy with small gifts, such as an outfit, tomatoes, doughnuts, and snacks, during the time period.

In recent decisions, this Court has noted that "[i]n determining a parent's capacity to pay support, it is not enough for a petitioner to 'simply prove that [the parent] was not disabled during the relevant timeframe' and therefore assume that he or she was capable of working and providing support." *In re Mya V.,* No. M2016-02401-COA-R3-PT, 2017 WL 3209181, at *4 (Tenn. Ct. App. July 28, 2017) (quoting *In re Josephine E.M.C.*, No. E2013-02040-COA-R3-PT, 2014 WL 1515485, at *18 (Tenn. Ct. App. Apr. 17, 2014),

A: Yes. Well, I mean, I know that I'm her mother and it is my duties to make sure she is provided for and taken care of, which I have not performed all the way or much at all.

- 14 -

*perm app. denied* (Tenn. July 23, 2014)). Rather, Tennessee courts have noted that proof of employment and earned wages is not sufficient to prove that parent has the capacity to provide support absent evidence of income and expenses. *See **In re Adoption of Angela E.**,* 402 S.W.3d at 641 (reversing the trial court's determination of father's willful failure to support where father had paid a not-insignificant amount during the relevant period and "[n]o evidence was introduced concerning [f]ather's monthly expenses[,]" although father was earning $150,000.00 annually); ***In re Noah B.B.**,* No. E2014-01676-COA-R3-PT, 2015 WL 1186018, at \*8–\*9 (Tenn. Ct. App. March 12, 2015) (holding that although mother affirmatively answered that she was working during the four-month time period, DCS failed to prove by clear and convincing evidence she willfully failed to support child because DCS did not provide "evidence of [m]other's employment status, . . . the number of hours she worked, the duration of her employment, her rate of pay, or whether [m]other had assets other than regular income that might contribute to support of the child."); ***In re Josephine E.M.C.**,* 2014 WL 1515485, at \*17–\*18 (holding that DCS failed to prove by clear and convincing evidence that mother had the capacity to support the child and had no justifiable excuse for not doing so even though mother worked two jobs on occasion and had previously been ordered to pay support because "there was little to no evidence presented at trial regarding Mother's income and expenses").

The "burden to prove Mother's abandonment by willful failure to support rests squarely on" Grandparents. ***In re Noah B.B.**,* 2015 WL 1186018, at \*9. The record in this case, however, lacks clear and convincing evidence to support this ground for termination. It is our view Grandparents failed to present sufficient evidence that Mother had the capacity to provide support and or to rebut her justifiable excuse for failing to do so during the relevant period. Indeed, there is a complete lack of evidence concerning her hours worked, wage earned, overall income, or expenses during this time in the record, and Mother repeatedly testified that her failure to work was due to circumstances outside her control. Recently, this Court reversed a trial court's determination that a parent willfully failed to support her children, where the evidence showed that the parent worked only intermittently during the relevant period and her access to transportation was hampered. ***In re T.W.**,* No. E2017-00317-COA-R3-PT, 2018 WL 1831109, at \*8 (Tenn. Ct. App. Apr. 17, 2018) (citing ***In re Alysia S.,*** 560 S.W.3d 536, 570 (Tenn. Ct. App. 2014) ("Simply finding that Mother worked and was compensated at some point during the four-month period does not, by itself, mean that she had the ability to pay child support."). Under those circumstances, we held that the evidence was insufficient to eliminate "'any serious or substantial doubt'" as to the parent's capacity to support during the relevant time. ***Id.*** (quoting ***In re Bernard T.**,* 319 S.W.3d 586, 596 (Tenn. 2010)). Likewise, we conclude that Grandparents failed to prove by clear and convincing evidence that Mother willfully failed to support her child. We therefore affirm the trial court's determination on this ground.[9]

---

[9] We note that both parties spend the great majority of their briefs presenting arguments regarding whether Mother was aware of a child support order requiring her to pay $308.00 per month in child

## Father

Next, we will analyze Father's argument that the trial court erred in finding that he willfully failed to support his child under Tennessee Code Annotated section 36-1-102(1)(A)(iv). As an initial matter, it appears that there is no dispute that this definition of abandonment is applicable to Father, as he was incarcerated "during all or part of the four (4) months immediately preceding the institution of such action or proceeding"; Father was incarcerated from September 29, 2015 to December 2, 2015, leaving incarceration approximately nine days before the December 11, 2015 termination petition was filed. *Id.* Determining the four-month period relevant to Father's alleged willful failure to support, however, is somewhat more difficult. According to Tennessee Code Annotation section 36-1-102(1)(A),

> [i]f the four-month period immediately preceding the institution of the action or the four-month period immediately preceding such parent's incarceration is interrupted by a period or periods of incarceration, and there are not four (4) consecutive months without incarceration immediately preceding either event, a four-month period shall be created by aggregating the shorter periods of nonincarceration beginning with the most recent period of nonincarceration prior to commencement of the action and moving back in time.

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (noting other rules used to determine the correct time period that are not applicable in this case). Thus, Father's relevant four-month period runs from June 5, 2015 to September 28, 2015, and resumed December 3, 2015 to December 10, 2015, due to his incarceration. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv). Father provided $80.00 of support to Grandparents during the relevant time period. Regarding this ground, the trial court found the following:

> The testimony at trial showed that [Father] was able-bodied and had the ability to work during the relevant time frame. Proof at trial showed that he paid a token amount of child support during this four (4)-month period. [Father] provided receipts totaling Eighty Dollars ($80.00). There was no proof introduced at trial that the Father petitioned the Court to set or hold support payments during the pendency of his proceedings. . . . The Court finds that [Grandparents] have proven that the Father willfully failed to provide more than token support during the relevant time period by clear and convincing evidence.

---

support payments. Resolution of this dispute is unnecessary, however, because the evidence in the record does not clearly and convincingly establish Mother's ability to provide support during the relevant period.

On appeal, however, Father argues that this evidence was insufficient to find willful failure to support because, like with Mother, Grandparents failed to offer evidence of Father's expenses during the relevant time period. Respectfully, we cannot agree.

First, we note that the record provides ample evidence that Father was working and earning a significant wage during the four-month period. Regarding his income during the four-month period, Father stated:

> [Grandparents' Attorney]: You've testified that your job for the last four years has largely been construction work?
>
> [Father]: For the most part, yes, sir.
> Q: And you, generally had made about a hundred dollars a day?
> A: Yeah. I guess I could average it out about that, a little less, a little more.
> Q: Okay. And you work five days a week?
> A: Yes, sir, weather permitted.[10]

Despite Father's income of up to $2,000.00 per month, he provided support to his child of only $80.00: receipts in the record indicate that Father paid weekly support payments in the amount of $20.00 per payment in July 2015. Father did not dispute that these were the only support payments made both during the four-month period and in the child's lifetime.

Most importantly, Father admitted that he could have paid child support throughout the child's life, but chose not to. His relevant testimony regarding his failure to provide support to Addy follows:

> [Grandparents' Attorney]: You know that you have a duty to financially support [Addy]?
> [Father]: Yes, sir.
> Q: You've known that you had a duty to financially support her since the day she was born, didn't you?
> A: Yes, sir.
> Q: However, you've only paid the $80 in child support –
> A: Yes, sir.
> Q: -- over the four years. Yes?
> A: Yes, sir

* * *

---

[10] Importantly, while a short period of Father's four-month period of non-incarceration took place in winter, which could foreseeably have prevented Father from working outdoors, the significant portion of the four-month period took place in summer.

Q: Okay. And you could've paid child support?
A: I – yes, sir, I could have.
Q: But you didn't?
A: But I didn't.
Q: Had the ability to work?
A: Yes, sir.
Q: You did work, yet you didn't pay support. You're not dis – is that a yes?
A: Yes, sir.
Q: You're not disabled?
A: No, sir.
Q: So you have absolutely no excuse today for why you did not pay support the four-months before you went to jail?

A: There wouldn't be a good enough excuse, even if I did. I should have been paying support. I admit that. I was wrong. I should have been paying child support this entire time.

Thus, Father openly admitted that he willfully failed to provide support for his daughter and that he had no justifiable excuse for his failure to do so.

Support is considered "token" when "under the circumstances of the individual case, [the support] is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). In determining whether support was insignificant given the parent's means, this Court must consider "evidence regarding both the parent's actual financial support of his or her child and the parent's 'means.'" *In re Noah B.B.*, 2015 WL 1186018, at *8. Additionally, "[t]he definition of token support itself requires consideration of the circumstances of the individual case." *Id.* (quoting *In re K.C.*, No. M2005-00633-COA-R3-PT, 2005 WL 2453877, at *9 (Tenn. Ct. App. Oct. 4, 2005) (citing Tenn. Code Ann. § 36-1-102(1)(B))). While we agree that the lack of evidence regarding expenses is troubling in this case, we cannot ignore Father's own admission that he had no justifiable excuse for his failure to pay child support while he was gainfully employed. Here, the evidence shows that Father paid less than five percent of his approximate monthly earnings for only a single month of the four-month period. Thus, even if $80.00 was the uppermost that Father was able to pay after paying his expenses, the record shows that he had the ability to make this payment throughout the four-month period, rather than for a single month. This amount is therefore clearly token under the circumstances. Coupled with Father's admission at trial that he had the knowledge and ability to pay support but did not do so, we conclude that Grandparents provided clear and convincing evidence that Father willfully failed to provide no more than token support in the relevant period. The trial court's finding that clear and convincing evidence exists that Father failed to provide support for his daughter is affirmed.

*Best Interest*

As a ground exists to terminate Father's parental rights, we will proceed to analyze whether it is in Addy's best interest to terminate Father's parental rights. Because we found no ground for termination regarding Mother, we will not engage in a best interest analysis for Mother.

When at least one ground for termination has been established, the court must then consider if termination is in the best interest of the child. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). Upon establishment of a ground for termination, the interests of the child and parent diverge, and the court's focus shifts to consider the child's best interest. *In re Audrey S*., 182 S.W.3d at 877. Tennessee's parental termination statutes recognize that although a parent may be unfit, terminating that parent's rights may not be in the best interest of the child. *Id.* As the Tennessee Supreme Court recently explained:

> Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.,* 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

*In re Gabriella D.*, 531 S.W.3d 662, 681–82 (Tenn. 2017).

The Tennessee Legislature has codified certain factors for the court to consider in its determination of whether termination is in a child's best interest. The factors include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

> (2) Whether the parent or guardian has failed to affect a lasting adjustment after reasonable efforts by available social services agencies for such

- 19 -

duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).  We further note that a trial court does not have to find the existence of each enumerated factor before it may conclude that termination is in the child's best interest.  *In re Navada N.,* 498 S.W.3d at 607.  Therefore, "[d]epending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis." *Id.*  However,

> this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must

- 20 -

consider all of the statutory factors, as well as any other relevant proof any party offers.

***In re Gabriella D.***, 531 S.W.3d at 682. Moreover,

> Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case.

***In re Audrey S.***, 182 S.W.3d at 878 (citing ***White v. Moody***, 171 S.W.3d at 194).

In this case, the trial court made some findings of fact and conclusions of law in support of its determination that terminating Father's rights would not be in the best interest of the child. Although the trial court in this case did not analyze each of the nine factors enumerated in the statute, the trial court did specifically mention the existence of the nine factors when determining the best interest of the child. While we conclude that the trial court's order is sufficient to determine whether termination is in Addy's best interest in this case, we urge trial courts to make specific findings regarding each factor, and any other considerations, in all future decisions. *See **In re Gabriella D.***, 531 S.W.3d at 682 (discussing the court's obligation to consider "all the factors and all the proof"). We also agree with the trial court's determination that the enumerated factors do not establish that it would be in Addy's best interest to terminate Father's rights at this time.

First, Father's long history of drug abuse and brief periods of incarceration prior to trial are troubling in relation to the stability and safety of Father's home and to Father's mental and emotional state. *See* Tenn. Code Ann. §§ 36-1-113(i)(7) & (8). We also note that Father, after passing out due to illegal drug use, choked Mother as she was trying to wake him up. Mother testified however that this incident occurred before Addy was born, and there was no evidence of any abuse toward Addy or any other person perpetrated by Father during the child's life. *See* Tenn. Code Ann. § § 36-1-113(i)(6). The evidence indicates, however, at the time of trial, Father was endeavoring to make a lasting adjustment in circumstances in order for Addy to be safe in his home. *See* Tenn. Code Ann. § 36-1-113(i)(1) & (2). It is also concerning that Father failed a drug test in December 2016, approximately three months prior to the trial; however, since that failed drug test, Father has attended and completed drug treatment and also passed a drug test given by his probation officer on the trial date. Further, at the time of trial, Father had been living with his girlfriend and her son since November 2016. At trial, Father's girlfriend testified that she had never personally witnessed Father take illegal drugs (although she was aware that he failed a drug test in December 2016) and has seen no signs of drug use in their home. Father's girlfriend also stated that Father takes good care of her son and has provided support for her and her son during the four months they have

lived together. Father is clearly making an effort to improve his circumstances. Comparing Father's undisputed prior drug abuse with his somewhat belated effort and success in treating his issues and maintaining a safe and stable home, we conclude that these factors weigh in favor of termination.

Next, Father has maintained visitation with Addy when he was not incarcerated. Testimony from Father and his sister both indicate that Father has attended all allowed visitations, with the exception of the time he was incarcerated or in a rehabilitation program. In his testimony, Grandfather admits that Father, or a member of Father's family, has exercised visitation with Addy over ninety percent of the time. It is, therefore, our view that Father has maintained regular visitation with Addy. *See* Tenn. Code Ann. § 36-1-113(i)(3).

Unlike many of the termination cases analyzed by this Court, the record also reflects that Father has maintained a meaningful relationship with Addy. *See* Tenn. Code Ann. § 36-1-113(i)(4). Addy calls him "Daddy." The two are affectionate when they are together, and she is always excited to see him. Addy also has a meaningful relationship with Father's extended family. Addy is especially close with her cousin and her aunts. We note that the trial court put great weight on this factor stating that "[t]his is particularly important in this case for Addy." These factors weigh against termination.

A change in caretakers, however, would certainly have a negative effect on Addy. *See* Tenn. Code Ann. § 36-1-113(i)(5). Grandparents have raised Addy since she was born. Grandparents also provide Addy with a stable, loving home, as well as financially support her. Both Mother and Father agree that Grandparents have done a wonderful job raising Addy and neither have any complaints as to Grandparents caring for her. There is also testimony that Addy adores her Grandparents. Furthermore, Father has failed to provide Addy with any financial support since the petition was filed even though he has been providing support for his girlfriend and her son for four months. *See* Tenn. Code Ann. § 36-1-113(i)(9). These factors certainly weigh in favor of termination.

In addition to the factors listed in section 36-1-113(i), the trial court found that it

Agree[d] with the opinion of the Guardian ad Litem that the best interest of the minor child would not be served by severing the parent-child relationship of only one parent and that if the termination is not granted as to both parents, it would not be in the child's best interest to sever either parental relationship.

Grandparents argue that "the trial court determined that because it would not sever the relationship with the Mother, the Father also remained a parent by default." We do not agree that the trial court found that the continuation of Mother's parental rights to the child, *ipso facto*, required the trial court to find that termination was inappropriate as to

Father. Indeed, had the trial court made such a finding, it would have been unnecessary for the trial court to discuss any other factors relevant to best interest; the trial court, however, clearly contemplated a number of factors in its best interest determination.

Moreover, we agree that the trial court was permitted to consider this fact among the factors relevant to its best interest analysis. As previously discussed, the list of factors contained in section 36-1-113(i) is non-exclusive. *See* Tenn. Code Ann. § 36-1-113(i) (stating that the court "is not limited to" consideration of the enumerated factors); ***In re Gabriella***, 531 S.W.3d at 681 (citing ***In re Carrington H.***, 483 S.W.3d at 523) ("These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis."). Here, the guardian ad litem expressly recommended that Father's parental rights not be terminated if Mother's parental rights remained intact. This Court has previously affirmed best interest determinations by trial courts that rested, in part, on the recommendations of guardian ad litems. *See, e.g.,* ***In re Kayden H.***, No. E2014-02360-COA-R3-PT, 2015 WL 3876365, at *13 (Tenn. Ct. App. June 23, 2015) (discussing the guardian ad litem's recommendation). Moreover, the fact that only one parent's rights are subject to termination may also be considered by Tennessee courts:

> When termination of both parents' rights is sought by a petitioner with the intent of adoption, there is no statutory bar that prohibits the trial court from terminating one parent's parental rights while denying termination of the other parent's parental rights. However, whether only one parent's parental rights should be terminated may be an appropriate consideration in the best interest analysis.

***In re Brooke E.***, No. M2016-02370-COA-R3-PT, 2017 WL 6606862, at *16 (Tenn. Ct. App. Dec. 22, 2017) (citations omitted); *see also* ***In re Liam S.***, No. E2016-02461-COA-R3-PT, at *11 (Tenn. Ct. App. Oct. 4, 2017) (reversing a trial court's best interest finding against father, where mother's parental rights were not terminated, noting that the court "do[es] not wish to leave the [c]hildren without a father if the proceedings following remand establish that termination of [m]other's parental rights is not in the best interest of the [c]hildren"). In this case, the trial court and guardian ad litem clearly considered whether only Father's rights should be terminated, and concluded that it would not be in Addy's best interest to sever only Father's rights in this case. The evidence in the record does not preponderate against this finding.

Reviewing all the factors applicable in this case, we cannot conclude that clear and convincing evidence supports a determination that the child's best interests will be served by terminating Father's parental rights. Clearly, the trial court was entitled to place particular weight on the meaningful relationship that had been maintained by Father with the child through visitation, as well as the fact that Mother's parental rights had not been terminated. This Court has previously indicated that in some cases the lack of a

meaningful relationship between a parent and child is the most important factor; it is not error for a trial court to place similar weight on the fact that such a relationship exists. *See, e.g.,* **In re Jayvien O.**, No. W2015-02268-COA-R3-PT, 2016 WL 3268683, at \*9 (Tenn. Ct. App. June 7, 2016) (affirming the trial court's decision where it found the lack of meaningful relationship the "most important[]" factor); **In re Terry S.C.**, No. M2013-02381-COA-R3-PT, 2014 WL 3808911, at \*18 (Tenn. Ct. App. July 31, 2014) ("[P]erhaps most importantly, [the mother] has failed to maintain regular visitation with the children and therefore has no meaningful relationship with them"). From our review of the record as a whole, the facts as found by the trial court indeed militate in favor of maintaining the parent-child bond between Father and the child. In a similarly "close case" this Court has held that allowing the parent to continue a relationship with the child supported denying termination of parental rights even where the children were in a loving pre-adoptive home and questions remained as to whether the parent could effectively parent the child. *See* **In re Liam S.**, No. E2016-02461-COA-R3-PT, 2017 WL 4422342, at \*11 (Tenn. Ct. App. Oct. 4, 2017) ("We, like the trial court, believe that is [] an extremely close case."). Under this circumstance, Grandparents failed to meet their burden to show that termination is in the child's best interest.

CONCLUSION

The judgment of the Coffee County Chancery Court is therefore affirmed. The costs of this appeal are taxed to Appellants Anthony O. and Bethany O., for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE