IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 3, 2018

## IN RE JEFFERY D.

**Appeal from the Chancery Court for Lewis County**
**No. 2017-CV-13     Michael Binkley, Chancellor**

_____

## No. M2018-01280-COA-R3-PT

_____

Father appeals the trial court's decision to terminate his parental rights on the grounds of abandonment by failure to visit and abandonment by wanton disregard for the welfare of the child as well as the court's best interest determination.  Because we find clear and convincing evidence supports the trial court's decisions regarding both grounds for termination and the best interest of the child, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and JOHN W. MCCLARTY, J., joined.

Dana Lloyd Dye, Centerville, Tennessee, for the appellant, Jeffery K. D.

Larry Joe Hinson, Jr., Hohenwald, Tennessee, for the appellees, Christopher D. M. and Amy L. M.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

Jeffery K. D. ("Father") is the father of Jeffery D., born in October 2013.[1]  On February 27, 2017, Christopher D. M. and his wife, Amy L. M. (collectively, "the petitioners"), filed this petition against Father for termination of his parental rights and adoption.[2]  According to the petition, the foster family acquired custody of Jeffery in

_____

[1] Jeffery D.'s mother surrendered her rights to the child and her parental rights are not at issue in this appeal.

[2] Christopher D. M. is the brother of the minor child's biological mother.

February 2014 by juvenile court order, and the child had been living with them since he was approximately four months old. The petitioners alleged that termination of Father's parental rights was warranted on the grounds of abandonment by failure to visit or pay child support during the four months immediately preceding his incarceration and wanton disregard for the welfare of the child. At the time of the filing of the petition, Father was serving a prison sentence for second degree homicide.[3] Counsel was appointed for Father, and Father filed an answer in opposition to the petition.

The trial

The case was tried on October 30, 2017. Father was present at the hearing and was called as the petitioners' first witness. He acknowledged that he was convicted of second degree murder in 1986. Asked to describe the incident, Father stated that he got into an argument with another man and beat him to death, then set the man's house on fire (so that the body burned up). Father was seventeen years old at the time. He was sentenced to life and was in prison until released on parole in September 2011.

In early February 2014, Father violated his parole by obtaining new criminal charges—"simple possession, drug paraphernalia, and a possession charge that was dismissed"—and he was eventually sent back to prison. Father was paroled again on July 1, 2015, but he violated the conditions of his parole with a simple possession charge in January 2016. While in jail on the simple possession charge, Father was served with charges from another county for theft of services. The latter charges were ultimately dismissed. Father returned to prison on March 1, 2016. At the time of the termination hearing, Father was still serving this parole revocation sentence.

During the time when he was out on parole the first time (in 2012), Father met Crystal M. ("Mother") when they worked together at a truck stop, and they began a relationship. They lived together in Columbia, Tennessee when Jeffery was born. The juvenile court became involved with the couple in February 2014 when Father was charged with possession of drug paraphernalia and possession. According to Father, the possession charge was dismissed, and he served eighteen months for possession of drug paraphernalia. Father and Mother lost custody of Jeffery in February 2014. The foster family obtained custody of the child and have had custody since that time.

Father acknowledged that, from the time that he was released on parole the second time on July 1, 2015, until he returned to jail on January 28, 2016, he was out of jail and able to visit his child. Father was asked what steps he took to visit with his son. He testified that Mother told him that he would have to "go through" her to see the child. He

---

[3] In October 2017, the petitioners filed an amended petition adding the child's mother as a co-petitioner to show her consent to the adoption.

stated that he "didn't take any steps." Father testified: "So the only thing I could do was ask her, could we see the child. And then she would make a phone call and we would go from there, sir." Father's testimony continued:

> Q. All right. So you said it was—that it was given to you or told to you that you had to go through someone?
> A. I had to go through [Mother].
> Q. And who told you that?
> A. [Mother].
> Q. Okay. All right. So [Mother] told you that you had to go through her, [Mother]?
> A. Yes.
> Q. All right. But Mr. and Mrs. [M.] never told you anything of that nature, correct?
> A. No, sir.
> Q. Okay. All right. So when you were released July 1st, 2015, what did you do to visit with your son or have contact with your son?
> A. Had [Mother] contact her brother and his wife to see if we could see Jeffery, Jr.
> Q. Okay. And did she do that?
> A. Yes.
> Q. All right. And was a visit set up?
> A. Yes.
> Q. All right. When did that visit occur? Do you recall?
> A. Somewhere close to the 4th, I do believe. We went to the river to see him.
> Q. All right. And, in fact, you and [Mother] went to the [petitioners'] home, correct?
> A. We went to the river to see our child.
> Q. But you had to pick up Mr. [M.] at his home?
> A. Yeah, yeah, yeah. Yes, sir. We did, we did.
> . . . .
> Q. And then you, Mr. [M.], and [Mother] drove to the river, correct?
> A. Correct.
> . . . .
> Q. All right. But during that trip to the river, did Mr. [M.] ever tell you you couldn't visit or he didn't want you to visit or anything of that nature?
> A. No, sir. Those words were never spoken to me.
> Q. Okay. All right. Was there any problems or issues during the trip, anything that Mr. [M.] did that was—that you felt was inappropriate?
> A. No, sir.
> . . . .
> Q. And did you visit with the child?

A. Yes, sir.

Q. All right. And how did that visit go?

A. I thought it went well, sir.

Q. All right. And you said that that was around the 4th of July of—

A. I believe it was, sir.

Q. Okay. And that would have been 2015, correct?

A. 2015, sir.

. . . .

Q. All right. After that visit, did you visit any more after that?

A. No, sir.

. . . .

Q. All right. So after that visit around the 4th of July, did you ever take any steps to set up a visit or ask for a visit?

A. I didn't ask them.

. . . .

Q. –Mr. and Mrs. [M.]?

A. Mr. and Mrs. [M.]. I didn't ask them myself. Like I said, sir, when I wanted to see Junior or I thought about seeing Junior, I was told by [Mother] that she would be the one to talk to them to see if we could see Junior.

Q. All right.

A. So that's what I was going on.

Q. All right. Did you ever take any steps to tell [Mother], hey, I want to see my son?

A. Yeah. I told her I wanted–I would like to see Junior.

Q. All right. But did you ever tell her, call your brother and tell him I want to see my son?

A. I couldn't tell her to do anything. I could ask her to do it, and if she did it, she did it. If she didn't, she didn't.

Q. All right. And are you saying that you did ask her?

A. Yes, sir, I did.

Q. And that she didn't do it?

A. I didn't—no, sir, I didn't say she didn't do it. I said that she would do it. If she did it, sometimes she would do it in front of me. Sometimes she would do it, and then tell me the results of it.

Q. All right.

A. [Mother], that is.

Q. All right. So what did she tell you was the reason for not having a visit?

A. She said that the reason that we couldn't see [the child] is because we didn't have our lives straight and that they didn't want us involved with him if our lives weren't straight.

Q. But Mr. and Mrs. [M.] never told you that, correct?

A. No. I told you. I never talked to them.

. . . .

Q. When you visited at the river, they never told you not to come back or don't call or anything of that nature?

A. No, sir.

Q. Okay. Is it your testimony that you never saw [the child] after that July visit.

A. Never.

Q. Okay. Well, sir, if you wanted to see your son, why wouldn't you just say, [Mother], I know you don't want me contacting them, but I'm going to contact them myself, or something to that effect?

A. Sir, there was underlying things that was going on, underlying things that were said to me about that situation completely. First of all, I was told—when I first met her, I was told by her, her family doesn't like blacks. So, therefore, I did not—

. . . .

Q. All right. But Mr. and Mrs. [M.], obviously, took [the child] into their home, correct?

A. Correct, sir.

Q. And when you visited with him, did he appear to be happy?

A. Yes, sir.

Q. All right. Did he appear to be loved by Mr. and Mrs. [M.]?

A. Yes, sir.

Q. Okay. And even before you went to jail, had you not, at one point, gone to Thanksgiving dinner at the [petitioners']—at [Mother's]—at the [petitioners'] family for Thanksgiving dinner?

A. Yes, sir. Yes, sir.

. . . .

Q. And did Mr. and Mrs. [M.] treat you in any way—any hostile way?

A. No, they didn't treat me hostile, sir.

Q. Okay. All right.

A. They didn't love me, either, but they didn't treat me hostile.

. . . .

Q. You've never called Mr. or Mrs. [M.] and said, hey, let me talk to my son?

A. No, sir.

Q. You've never wrote them a letter or wrote [the child] a letter?

A. No, sir.

When questioned by his own attorney, Father testified that he was involved in Mother's pregnancy and that he took care of Jeffery during the day for three or four months during the child's infancy. He acknowledged that, after the child was born, "we started back partying and, you know, things progressed from there." When he was

paroled in 2015, Father worked at Hardee's and set up automatic child support payments out of his paychecks.

Father testified that he would be eligible for parole in March 2018. He was housed in an honor unit set up for exemplary prisoners and had obtained his forklift operator license. If paroled, he planned to move to Jackson, Tennessee, where his family lived, and a company there had already offered him a position.

On redirect examination, Father testified that, before Jeffery was born, he and Mother sold and used drugs. He admitted that he smoked weed. Father testified that he had an official address that he gave his parole officer (not the address where he actually lived with Mother), and he would sell crack and weed out of that address. After Jeffery was born, they stopped selling drugs, but then they started going down the wrong path again--selling crack and weed and using drugs. Father testified that he only used weed. The drug activity continued until Father returned to prison.

The petitioners' next witness was Mother, who testified that she used methamphetamines and crack cocaine while Jeffery was in her care and that Father also used drugs during this time. According to Mother, Father used crack and weed when the child was in their care.

Mother testified about the July 4, 2015 visit when she arranged for Father to come with her to the river with Mr. M. and Jeffery. Mother and Father drove and picked up Mr. M. and others at the petitioners' residence and they all drove to the river together. Mother continued her testimony:

Q. And during that ride or during that visit, did anybody make any derogatory remarks to [Father] or—
A. No, sir.
Q. –any racist remarks that you heard?
A. No, sir.
Q. Did you ever tell [Father] that your brother or his wife were racist?
A. No, sir.
Q. Or that your family was racist?
A. No, sir.
Q. Have you ever seen them act in a racist way toward [the child]?
A. No, sir.
Q. Or anyone else?
A. No, sir.
Q. Now, did you tell [Father] that he could not contact the [petitioners] directly?
A. No, sir.

Q. All right. Did you ever give him a phone number or an address for him to contact them for himself?
A. Yes, sir, I did.
Q. Okay. Can you tell the Court how that came about or how that happened?
A. Yes, sir. I made sure it was all right with my brother, Chris, and everything, to put—give him the number and the address to the house. I put it in [Father's] phone.

On cross-examination, Mother said that Father had asked her to call her brother to see if he could visit Jeffery and she had done so. After the July 2015 visit, however, Mother testified that "we never made inquiries about going to see him." The testimony proceeded as follows:

Q. So if [Father] testified that, in his presence, you called your brother and your sister-in-law several times and asked for visits and were denied, you say that would be wrong?
A. Yes, ma'am.
Q. Okay. So you're telling this Court that you never asked for any more visits with your son after July of 2015?
A. Yes, ma'am.
Q. Never?
A. No.
Q. Not one. What was your thinking on that? Why would you not?
A. I was doing things that I didn't need to be doing.

Amy M., one of the petitioners, testified that she and Christopher M. had been married for 27 years and had three grown children and three grandchildren. She was employed at LabCorp. Amy and Chris M. received a telephone call from Mother in February 2014 telling them that there was a Department of Children's Services ("DCS") worker at her house and that she needed someone to take Jeffery. The petitioners agreed to take Jeffery, and the child had been with them ever since then. Father saw the child when he came to the river on July 4, 2015, and also saw him briefly later that month at a benefit for Chris's brother. Father had not seen Jeffery since that time.

Mrs. M. testified that Father had not called her or, to her knowledge, her husband to ask for a visit or to speak to Jeffery. Neither she nor her husband had told Mother or Father that Father could not call or come to visit. The petitioners had not received any letters from Father. Mrs. M. denied having any racist beliefs that affected her ability to love Jeffery. She testified about some health problems experienced by Jeffery that required medication and medical attention.

Mrs. M. stated that Jeffery got along with her other grandchildren and spent time with them. Mrs. M. testified that the entire family loved Jeffery "as a member of the family," "[l]ike he's ours." They also made sure that he maintained contact with his two biological siblings.

Mr. M. corroborated his wife's testimony. He worked for a trucking company but was home every night. Mr. M. stated that he and Father had one another's phone numbers. He recalled that, after the Fourth of July visit, there was one other time when Mother texted about visiting and Mr. M. knew that Mother and Father were "running in the wrong places." He told her "they needed to do the right—the appropriate thing to get their visitation back, and I didn't hear anything else about it."

The petitioners also called three character witnesses who testified briefly about the healthy parent-child relationship between the petitioners and Jeffery.

In a detailed memorandum and order entered on June 14, 2018, including findings of fact and conclusions of law, the trial court determined that two grounds for termination had been proven by clear and convincing evidence: (1) abandonment by willful failure to visit pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A), and (2) wanton disregard pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(iv). The trial court further determined that there was clear and convincing evidence that termination of Father's parental rights was in the best interest of the child.

## Issues on appeal

Father asserts that the trial court erred (1) by terminating his parental rights on the ground of abandonment by willful failure to visit, (2) by terminating his parental rights on the ground of wanton disregard for the child's welfare, and (3) by concluding that the termination of his parental rights was in the best interest of the child.

### STANDARDS GOVERNING PARENTAL TERMINATION TRIAL PROCEEDINGS AND APPELLATE REVIEW

The Tennessee Supreme Court has described the appellate review of parental termination cases as follows:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as

- 8 -

supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016) (citations omitted); *see also In re Gabriella D.*, 531 S.W.3d 662, 680 (Tenn. 2017).

The termination of a parent's rights is one of the most serious decisions courts make. As the United States Supreme Court has said, "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *Santosky v. Kramer*, 455 U.S. 745, 787 (1982). "Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger," *In re W.B., IV*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *6 (Tenn. Ct. App. Apr. 29, 2005), "and of 'severing forever all legal rights and obligations of the parent or guardian.'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(l)(1)).

A parent has a fundamental right, based in both the federal and state constitutions, to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996) (citing *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995) (citing *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993)). This right "is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d at 521-22, n.13 (citing U.S. Const. amend. XIV, § 1; Tenn. Const. art. 1, § 8). Although this right is fundamental, it is not absolute. *Id.* at 522. The State may interfere with parental rights only in certain circumstances. *Id.* at 522-23; *In re Angela E.*, 303 S.W.3d at 250-51. Our legislature has listed the grounds upon which termination proceedings may be brought. *See* Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and a parent's rights may be terminated only where a statutory basis exists, *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002*); In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "'Clear and convincing evidence enables the fact-finder to form a firm belief or

conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings.'" *In re Carrington H.*, 483 S.W.3d at 522 (quoting *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted)). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005) (citations omitted).

As a reviewing court, we "must 'distinguish between the specific facts found by the trial court and the combined weight of those facts.'" *In re Keri C.*, 384 S.W.3d 731, 744 (Tenn. Ct. App. 2010) (quoting *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007)). Then, we must determine "whether the combined weight of the facts . . . clearly and convincingly establishes all of the elements required to terminate" a party's parental rights. *Id.* (citing *In re Tiffany B.*, 228 S.W.3d at 156, and *In re S.M.*, 149 S.W.3d 632, 640 (Tenn. Ct. App. 2004)). "When a trial court has seen and heard witnesses, considerable deference must be accorded to the trial court's findings as to witnesses' credibility." *Id.* (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)).

Once a ground for termination is established by clear and convincing evidence, the trial court or the reviewing court conducts a best interest analysis. *In re Angela E.*, 303 S.W.3d at 251 (citing *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005), and *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004)). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *Id.* at 254. The existence of a ground for termination "does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006).

ANALYSIS

I. <u>Abandonment by failure to visit.</u>

Father argues that the trial court erred in concluding that the petitioners proved by clear and convincing evidence that he willfully failed to visit Jeffery within the four months immediately preceding his incarceration.

Tennessee Code Annotated section 36-1-102(1)(A)(iv) sets out the definitions of "abandonment" applicable to parents who are incarcerated when a termination petition is filed against them. When the petitioners initiated their case against Father, Tenn. Code Ann. § 36-1-102(1)(A)(iv)[4] defined "abandonment," in pertinent part, as follows:

---

[4] Tennessee Code Annotated section 36-1-102 was amended by 2018 TENN. PUB. ACTS c. 875, §§ 1 to 6,

A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Willfulness is a critical element of the definition of abandonment. As this court has stated, "Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent." *In re Audrey S.*, 182 S.W.3d at 863. Acting willfully means that "a parent who failed to visit or support had the capacity to do so, made no attempt to do so, and had no justifiable excuse for not doing so." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) (citing *In re Audrey S.*, 182 S.W.3d at 864); *see In re Audrey S.*, 182 S.W.3d at 863-64 (an individual acts willfully if he or she knows what he or she is doing and has the intention to do what he or she is doing).

The determination of whether a parent failed to visit a child is a question of fact. *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007)). The determination of "[w]hether a parent's failure to visit . . . constitutes willful abandonment, however, is a question of law." *Id.* A court will not find a parent has abandoned his or her child if the failure to visit the child is outside his or her control. *Id.*

The pertinent time period in this case runs from September 28, 2015, through January 27, 2016, the four months prior to Father's return to prison on January 28, 2016. There is no dispute that Father had no contact with Jeffery after July 2015. He argues that his failure to visit was not willful because his attempts to visit were thwarted by Mother. Father, who is black, asserts that Mother, who is white, advised him that he should not contact the petitioners (her brother and sister-in-law) directly, but should only contact them through her.[5] She purportedly told him that Mother and Father would not be allowed to visit Jeffery at the petitioners' home until they got their lives together. According to Father, he attempted to set up visits with the child (through Mother) during the time when he was out of jail. He denied having the petitioners' address or telephone number.

---

effective July 1, 2018.

[5] Father asserted at trial that Mother's family members were reported to be racists, although they never showed any animosity toward him.

We now review the trial court's findings relevant to the ground of abandonment by failure to visit. Credibility is a key issue here. With regard to abandonment, the willfulness of a person's conduct is dependent upon intent and, because intent "'is seldom capable of direct proof,'" "'triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.'" *Dep't of Children's Servs. v. Culbertson*, 152 S.W.3d 513, 524 (Tenn. Ct. App. 2004) (quoting *In re Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at *5 (Tenn. Ct. App. Nov. 25, 2003)). In making a determination of intent, a court may rely upon its assessment of the witnesses' credibility. *See In re Alex B.T.*, No. W2011-00511-COA-R3-PT, 2011 WL 5549757, at *8 (Tenn. Ct. App. Nov. 15, 2011). A trial court's credibility findings will not be overturned "absent clear and convincing evidence to the contrary." *Id.*

The trial court in the present case found the testimony of Mother, Mrs. M., and Mr. M. to be credible. As to Father, the trial court stated:

> The Court finds some aspects of Father's testimony were not credible. First, Father's demeanor while testifying was that of a person not telling the truth. Further, Father's claims of being substantially prevented from visiting the Minor Child by Mother and the Petitioners are unavailing. Mother testified she provided Father with the phone number of Mr. [M.], which was logged into Father's cellular phone. Additionally, Mr. [M.] testified he had Father's telephone number logged into his phone as well, and did not receive a telephone call from Father regarding setting up a visitation with the Minor Child after July 26, 2015.
>
> Furthermore, Father claimed he did not know where the Petitioners lived as a reason for failing to visit the Minor Child, yet, he drove Mother to the Petitioners' house to pick up Mr. [M.] on the day of his only visit with the Minor Child on July 4, 2015. Thus, the Court finds some aspects of Father's testimony to be not credible.

In its conclusions regarding the ground of failure to visit, the trial court further found:

> Here, the Court finds Mother and the Petitioners did not interfere with Father's ability to visit the Minor Child. Mother testified she logged Mr. [M.'s] phone number into Father's cell phone, which provided him with the cell phone number for Father to contact Mr. [M.] to set up a visit any time he wished. Further, Father drove to the Petitioners' home and picked up Mr. [M.] on July 4, 2015, providing Father with the location for where the Petitioners lived. Despite having this contact information for the Petitioners, Father failed to even call Mr. [M.] to check in on the Minor Child, instead relying upon Mother for updates. Furthermore, the

Petitioners testified they would have let Father visit with the Minor Child, however, they did not receive any contact from Father.

Although Father relies upon the assertion the Petitioners were racist against him, the Court has failed to find any evidence of such discrimination. Instead, the Court had found ample evidence of a parent with the right to exercise visitation with his son under the age of four (4) years old, but chose to stay away. This dereliction of duty cannot now be deflected towards Mother when it was Father's responsibility to visit. Thus, the Court finds if Father were to look for the true culprit of his failure to visit the Minor Child for over the span of four (4) months prior to his incarceration, he need only look into a mirror. The Court finds Father was aware of his duty to visit, had the capacity to do so, and made no such attempt. Father has no justifiable excuse. Thus, Father willfully failed to visit the Minor Child constituting abandonment by clear and convincing evidence.

The cases cited by Father are readily distinguishable. In *In re Emma S.*, No. M2017-01243-COA-R3-PT, 2018 WL 2041574 (Tenn. Ct. App. Apr. 30, 2018), the mother lived in another state from the legal custodians for her daughter and lacked a driver's license or a car. *In re Emma S.*, 2018 WL 2041574, at *8. Upon her release from incarceration, she immediately attempted to arrange a visit, but was unable to do so. *Id.* The appellate court, noting "the absence of an adverse credibility determination," found that the ground of abandonment by failure to visit had not been proven by clear and convincing evidence. *Id.* at *8-9. In the present case, by contrast, the trial court found Father not to be credible, particularly with respect to issues pertaining to the willfulness of his failure to visit. Moreover, the mother in *In re Emma S.* made efforts and showed a desire to visit her child, whereas Father did not call the petitioners or take the initiative to see Jeffery. *Id.* at *8.

Father also cites *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007), and *In re Heaven J.*, No. W2016-00782-COA-R3-PT, 2016 WL 7421381, at *6 (Tenn. Ct. App. Dec. 22, 2016), cases in which parents were thwarted in their efforts to visit their children and the courts found no willful failure to visit. As stated above, however, the trial court determined that Father lacked credibility and found no evidence that the petitioners or Mother were thwarting his efforts to see his child. Therefore, the principles relied upon by Father from these cases do not apply here.

The preponderance of the evidence supports the trial court's findings of fact, and these findings of fact constitute clear and convincing evidence to support the termination of Father's parental rights on the ground of abandonment by failure to visit.

II. Abandonment by wanton disregard.

Father's next argument is that the petitioners failed to prove by clear and convincing evidence that Father abandoned Jeffery by displaying wanton disregard for his welfare during the relevant time period.

Pursuant to Tenn. Code Ann. §36-1-102(1)(A)(iv), abandonment is defined to include a parent who is incarcerated at the time when the termination petition is filed and who "has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." The wanton disregard ground is not limited to the four months immediately preceding the parent's incarceration. *In re Audrey S.*, 182 S.W.3d at 871. The statutory language states, however, that the actions must occur "prior to incarceration." Tenn. Code Ann. § 36-1-102(1)(A)(iv); *In re Jeremiah N.*, No. E2016-00371-COA-R3-PT, 2017 WL 1655612, at *7 (Tenn. Ct. App. May 2, 2017). In the context of this provision, "child" includes the period of pregnancy. *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015); *see also In re Jamazin H.M.*, No. W2013-01986-COA-R3-PT, 2014 WL 2442548, at *9 (Tenn. Ct. App. May 28, 2014). This court has previously stated that "a person cannot disregard or display indifference about someone whom he does not know exists." *In re Anthony R.*, 2015 WL 3611244, at *3. Thus, the wanton disregard provisions "must be construed to require that the father has knowledge of the child at the time his actions constituting wanton disregard are taken." *Id.*; *see also In re Jeremiah N.*, 2017 WL 1655612, at *7.

This court has "repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867-68. The kinds of "actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, 2015 WL 3611244, at *3. For example, in *In re Jeremiah N.*, 2017 WL 1655612, at *6, after learning of the mother's pregnancy in April 2006, the father was indicted for possession with the intent to distribute cocaine in August 2006 (to which he subsequently pled guilty); a few months later, he engaged in aggravated domestic assault and resisting arrest, which was also a probation violation. This court determined that there was clear and convincing evidence that the father had engaged in conduct that constituted wanton disregard for the child's welfare. *In re Jeremiah N.*, 2017 WL 1655612, at *6.

As to Father's criminal history since Jeffery's birth, the trial court made the following relevant findings:

8. While the Minor Child was in Mother and Father's care, Mother admitted she used drugs, such as methamphetamine and crack cocaine. Additionally, Mother testified Father was present when this was occurring. Moreover, Mother also testified Father used crack cocaine and marijuana while caring for the Minor Child.[6]

9. After continuing on this path of drug abuse, Mother and Father began selling drugs, even though Father was on parole and Mother was on probation . . . .

10. In early February of 2014, Mother and Father were arrested in Maury County, Tennessee for possession of drugs and drug paraphernalia. . . . Father was also criminally charged with the possession of drugs and drug paraphernalia. These criminal charges violated Father's parole, and he was eventually incarcerated again for his parole violation.

. . . .

12. On July 1, 2015, Father was paroled for the second time. Additionally, Father began working as a cook at Hardees and paid child support for the Minor Child.

. . . .

14. After being released on parole, Father testified he and Mother "started going down the wrong path." Accordingly, Mother and Father began using and selling drugs again. As a result, Mother and Father were arrested in Giles County, Tennessee on January 28, 2016. Consequently, Father was released on February 11, 2016, but was later convicted of simple possession, which caused his parole to be revoked, and he was incarcerated on March 1, 2016 to begin his current period in prison.

15. Father will be eligible for parole in March of 2018. He has not seen the Minor Child since July 26, 2015, nor has he ever called the Petitioners to contact the Minor Child or written the Minor Child.

The trial court made the following findings regarding the wanton disregard ground for termination:

The Court finds Father's criminal history, as thoroughly examined in the above Findings of Fact section, establishes he has been given numerous chances to change his ways, but has continued down the path of drug use and criminal activity. Sadly, these actions show a wanton disregard for the welfare of the Minor Child. Father had full knowledge the continuation of using and selling drugs would likely result in his parole revocation and the eventual reinstitution of his life sentence; however, he regrettably persisted in these criminal activities. Therefore, the court finds this statutory ground

---

[6] In a footnote, the trial court stated: "Father testified he did not use drugs while he was caring for the Minor Child; however, the Court finds Mother's testimony to be more credible as to this matter."

for the termination of parental rights has been established by clear and convincing evidence.

Father's argument on appeal is that the two instances of parole violations in this case were "both misdemeanors and both stupid decisions." He asserts that "[t]hese two convictions within a period of two years do not mandate a finding of wanton disregard." The cases cited by Father are distinguishable on their facts. Unlike in the present case, the parents in *In re Dylan M.J.*, No. M2010-01867-COA-R3-PT, 2011 WL 941404, at *8 (Tenn. Ct. App. Mar. 17, 2011), and *In re Renaldo M.*, No. M2016-00472-COA-R3-PT, 2017 WL 1041541, at *5 (Tenn. Ct. App. Dec. 30, 2016), despite some lapses in behavior, were noted by the court to have "shown a great deal of care and concern" for their children and to have "made a genuine effort to establish a meaningful relationship" with them. As discussed in the previous section, Father failed to visit Jeffery even once during the four months preceding his incarceration and did not attempt to contact the petitioners at all. In *In re Kyle F.*, No. E2017-01821-COA-R3-PT, 2018 WL 1953210, at *4-5 (Tenn. Ct. App. Apr. 25, 2018), the court determined that the mother's failure to provide her probation officer with her new address, which was a probation violation, in combination with her other conduct (including staying in touch with the case manager, inquiring about the child's welfare, and participating in parenting classes and team meetings), was not sufficient to constitute wanton disregard. *See also In re E.C.*, No. E2016-02582-COA-R3-PT, 2017 WL 2438574, at *13 (Tenn. Ct. App. June 6, 2017). Father's probation violations in the present case were not mere technicalities, and he has not exhibited redeeming conduct such as the actions of the mother in *In re Kyle F. See In re Kyle F.*, 2018 WL 1953210, at *4.

Father knew that he was subject to re-incarceration if he committed additional criminal offenses, yet he did so twice, despite knowing the effect his actions would have upon his young child. The trial court's findings of fact are supported by a preponderance of the evidence, and these findings provide clear and convincing evidence to support the trial court's decision to terminate Father's parental rights on the ground of wanton disregard for the welfare of the minor child. We find no error in the trial court's decision.

III.  Best interest.

Having determined that clear and convincing evidence of at least one statutory ground exists to terminate Father's parental rights, we must next consider whether the trial court properly determined that termination of Father's parental rights is in the best interest of the child. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. After a court finds that clear and convincing evidence exists to support a ground for termination, the child's interests diverge from those of the parent and the court focuses on the child's best interests. *In re Audrey S.*, 182 S.W.3d at 877. A court must view the child's best interest from the perspective of the child, not that of the parent. *Id.* at 878. A finding that at least one ground for termination of parental rights exists does not

- 16 -

necessarily require that a parent's rights be terminated. *Id.* at 877. Because some parental misconduct is redeemable, our termination of parental rights statutes recognize that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* The facts a court considers in its best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). Once a court makes the underlying factual findings, it should "consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

When considering whether terminating a parent's rights to a child is in the child's best interest, a trial court is to consider the following non-exclusive factors:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). A trial court is not required to find that each of the enumerated factors exists before concluding that it is in the best interest of the child to

- 17 -

terminate a parent's rights. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Although in some circumstances "the consideration of one factor may very well dictate the outcome of the analysis," *In re Audrey S.*, 182 S.W.3d at 878, a court is still obligated to consider all of the statutory factors and all of the proof. *In re Gabriella D.*, 531 S.W.3d at 682 .

In this case, the trial court made findings regarding the statutory factors, as follows:

**1.** **Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian.**
Currently, Father is incarcerated at the Turney Center for violation of his second parole for the underlying prison term of a life sentence. Father submits his incarceration is based upon a crime which predated the Minor Child's [conception], and he has made adjustments to his conduct to make it safe and in his child's best interests to be in his home. However, the Court has failed to find any such adjustment of circumstances, conduct, or condition for it to be in the Minor Child's best interest to be in Father's home. First, Father does not currently have a home. While Father testified he hopes to move to Jackson, Tennessee, if he is granted parole for a third time, to be closer to family and to start his life over, this is still an uncertainty. Also, Father has not shown any adjustment to his conduct. Although Father asserts he has received honors in prison for good behavior, this is hardly a showing of a change in his conduct and circumstances when he is released from prison.
Thus, this factor appears to weigh against Father. He is currently serving a life sentence and, therefore, is unable to make any adjustments to the situation.
**2.** **Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible.**
As noted above, Father has maintained good behavior while in prison. Additionally, Father has completed a training course and been certified as a forklift operator in prison. Thus, the Court finds Father has made some reasonable efforts for a lasting adjustment in his life. This factor weighs in Father's favor in light of the current circumstances.
**3.** **Whether the parent or guardian has maintained regular visitation or other contact with the child.**
The Court finds this factor weighs against Father. While Father was on parole, he did not visit the Minor Child except for one occasion and has

- 18 -

not seen nor contacted the Minor Child since July 26, 2015. Additionally, while Father has been in prison, he has not written or sent any cards to the Minor Child. Further, Father has not called to speak with the Minor Child. Therefore, this factor appears to weigh against Father.

**4.    Whether a meaningful relationship has otherwise been established between the parent or guardian and the child.**

The Court finds Father has failed to establish a meaningful relationship with the Minor Child. Father has been incarcerated for the greater part of the Minor Child's life. Moreover, when Father has been out of prison and on parole, he has failed to visit and grow the bond between father and son. Although Father may have looked after the Minor Child for a few months after he was born, this is not a meaningful relationship. The true meaningful relationships the Minor Child has [are] with the Petitioners. Thus, the Court finds this factor weighs against Father.

**5.    The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition.**

The Court finds a change in caretakers would have a devastating effect on the Minor Child due to his bond with the Petitioners and the Petitioners' family. Additionally, such a change would remove the Minor Child from the only home he has ever known. Further, the Court finds such a change of caretakers may have a negative effect on the Minor Child's current medical condition. Mrs. [M.] testified the Minor Child has certain medical conditions, which involve taking medication twice a day and attending checkups regularly. The Court finds changing caretakers to Father, with an uncertain income and an unclear place to live, may have a negative effect on the Minor Child's medical condition. Therefore, this factor weights in favor of termination of Father's parental rights.

**6.    Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household.**

The Court finds this factor to not be applicable to the circumstances surrounding this case.

**7.    Whether the physical environment or the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner.**

The Court finds the Petitioners' home to [be] a very safe, healthy, and loving environment for the Minor Child. To the contrary, Father is currently incarcerated. Further, at the time the Minor Child was in the

- 19 -

custody of Father and Mother, the Home was riddled with criminal activity and drug abuse. Therefore, this factor weighs against Father as well.

**8.** **Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child.**

There is no evidence in the record as to Father's mental or emotional status which may or may not be a detriment to the Minor Child at issue.

**9.** **Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.**

Currently, Father is incarcerated, so he is unable to fulfill any child support payments. However, while he was on his second parole, it is undisputed he paid his child support obligation from his work as a cook at Hardees. Thus, the Court finds this factor weighs in favor of Father.

After weighing all of these factors, the trial court concluded that clear and convincing evidence established that it was in the best interest of the minor child to terminate Father's parental rights. The court noted that this conclusion was buttressed by Mother's waiver of her rights and support of the petitioners' adoption.

Father relies upon the case of *In re Addalyne S.*, 556 S.W.3d 774 (Tenn. Ct. App. 2018), to assert that, despite the presence of grounds for termination, termination of the parent-child relationship does not further the best interest of the child in this case. The present case bears no resemblance to *In re Addalyne S.*, which involved a minor child's grandparents who sought termination of the parental rights of the child's parents. *In re Addalyne S.*, 556 S.W.3d at 778. The court in *In re Addalyne S.* found no grounds for terminating the mother's rights, but found that clear and convincing evidence supported the trial court's finding that Father failed to provide support for his daughter. *Id.* at 791-92. Despite finding grounds for termination, the court concluded that termination of Father's parental rights was not in the child's best interest, particularly in light of "the meaningful relationship that had been maintained by Father with the child through visitation, as well as the fact that Mother's parental rights had not been terminated." *Id.* at 795.[7] In our case, by contrast, Father failed to visit Jeffery even once during the four months preceding his incarceration.[8] Thus, Father gave up the opportunity to establish any real relationship with the child. Although Father emphasizes in his brief that his incarceration stems from a crime that pre-dates the child's conception, Father was twice paroled after Jeffery's birth and made poor decisions that resulted in his re-incarceration.

---

[7] The court, in *In re Addalyne S.*, noted that it was a "close case." *In re Addalyne*, 556 S.W.3d at 796.

[8] He visited the child only once during the entire time he was out on parole.

- 20 -

Moreover, unlike in *In re Addalyne S.*, Mother has voluntarily surrendered her rights in order to allow Jeffery's adoption by the petitioners.

The evidence preponderates in favor of the trial court's findings of fact, and those facts provide clear and convincing evidence in support of the trial court's best interest determination.

CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the appellant, Jeffery K. D., and execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE