FILED
04/19/2022
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 1, 2022

**IN RE HARLEY K.**

**Appeal from the Circuit Court for Bradley County**
**No. V-20-331       Lawrence Howard Puckett, Judge**
_____

**No. E2021-00748-COA-R3-PT**
_____

Mother and Father appeal the termination of their parental rights, focusing solely on the issue of best interest. Because we conclude that the Tennessee Department of Children's Services presented clear and convincing proof of both grounds for termination and that the child's best interests would be served by the termination of both parents' parental rights, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and THOMAS R. FRIERSON, II, J., joined.

Wilton Marble, Cleveland, Tennessee, for the appellant, Debbie D.

Chessia Cox, Athens, Tennessee, for the appellant, Paul K.

Herbert H. Slatery, III, Attorney General and Reporter, and Lexie A. Ward, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

**OPINION**

**I. FACTUAL AND PROCEDURAL HISTORY**

This case involves the termination of Respondent/Appellant Debbie D.'s ("Mother") and Respondent/Appellant Paul K.'s ("Father") parental rights to their son, Harley K.,[1] born in February 2017. In September 2018, the Tennessee Department of

_____

[1] In cases involving termination of parental rights, it is this Court's policy to remove the full names of children and other parties to protect their identities.

Children's Services ("DCS") became involved due to Mother's incarceration on her tenth driving on a revoked license charge and Father's arrest following a police chase with the child in the car. DCS removed the child and placed him with Paternal Grandmother.[2] When Mother was released from jail, she was awarded supervised visitation. But Paternal Grandmother soon allowed Mother to take the child without supervision; indeed, the child began to reside with Mother at this time.

DCS received another referral in late May 2019 that the child was drug exposed and neglected when Mother was once again arrested for driving on a revoked license; the child was in the car with her. DCS apparently did not remove the child at that time. But DCS did eventually determine that removal was necessary in part because of Mother's and Paternal Grandmother's failure to abide by the supervision order.[3] As a result, an ex parte order was entered by the Bradley County Juvenile Court on June 26, 2019, placing the child in DCS custody. When the child came into custody he was very dirty, covered in bruises, had matted hair, and needed extensive dental work due to rotting teeth. The child was placed with a foster family, where he remained at the time of trial.

Eventually, DCS filed a petition to terminate both parent's rights on July 13, 2020. Trial on the petition occurred on June 2, 2021. Father appeared halfway through trial, claiming that he lost the paperwork that informed him of the date of trial. Mother, Father, a DCS worker, and the child's foster mother ("Foster Mother") testified.

Samantha Walker, the child's foster care worker, testified that she informed both parents of the Criteria and Procedures for Termination of Parental Rights during her tenure on the case, as well as prepared a Permanency Plan for both parents at the time the child entered DCS custody. Mother's and Father's requirements under the plan were largely identical. They were required to sign releases to allow DCS to obtain information, attend Narcotics Anonymous meetings, submit to random drug screens, complete an alcohol and drug assessment, participate in a mental health assessment, follow all recommendations, and allow DCS to monitor progress through monthly reports, take all medications as prescribed, attend child and family teams meetings and court hearings, not incur any new criminal charges, complete a parenting assessment and parenting course and submit proof to DCS, provide proof of a valid driver's license, insurance, and vehicle registration or a transportation plan, maintain a stable residency for six months and provide DCS with a copy of a lease, and participate in all visitation with the child in a positive manner.

Ms. Walker testified that to DCS's knowledge, the only requirements that Mother met were to complete a parenting class, provide DCS with a lease (two months before trial),

---

[2] The testimony at trial from the DCS foster care worker was that this was the seventh placement for the child throughout his life. Father strongly disputed that anyone other than himself, Mother, or Paternal Grandmother had ever had physical custody of the child.

[3] According to an affidavit of reasonable efforts filed by DCS in support of its petition for temporary custody, Paternal Grandmother explained that she could not care for the child due to her own health issues.

and complete a mental health assessment. But Mother had never provided DCS with a copy of the mental health assessment to indicate what recommendations were made or to determine whether Mother was following all recommendations as required. Mother testified that she asked for the assessment to be forwarded to DCS just a few days before trial and she had not heard anything since. Mother further testified that the mental health assessment did not recommend medication to deal with her previously diagnosed depression or bipolar disorder.

Mother had also failed to obtain a valid driver's license or submit a transportation plan to DCS. According to Ms. Walker, she gave Mother information to contact an entity named SETHRA[4] so that she would have transportation to visitations. Mother eventually informed DCS that she has set up SETHRA to take her to visitations, but later claimed that SETHRA did not pick her up for some visitations, causing her to miss the visits at the last minute. Mother testified at trial that she was still working with SETHRA to take her to visitations in the future. DCS, however, never received any confirmation from SETHRA that there were issues on their end in picking up Mother. Mother also testified that she was hoping to get her license back in thirty days, but that she was having difficulty raising the funds to reinstate her license.

Father had completed none of the requirements of the plan; he claimed, however, to have completed a drug class while in prison, but provided DCS with no documentation of that fact. According to Father, he and DCS agreed that he could not complete any other tasks due to his incarceration.

At trial, Mother was living in a two-bedroom apartment that she obtained approximately two months prior to trial. DCS performed a home study on the apartment and found it acceptable. Mother's central source of income was disability payments; she did not pay child support because DCS informed her that because she was on SSI, she did not need to pay child support. Mother also testified that she sometimes performs odd jobs to earn extra income; she has never reported the amount of income to DCS or paid any support as a result of this extra income. It was undisputed, however, that Mother did bring gifts to the child at visitation; the child often refuses to take the gifts home with him.

Father had been released from incarceration for approximately one month at the time of trial. He was living with Paternal Grandmother. He testified that he was working with a family member in construction and doing odd jobs, but that work was slow. Father admitted that he had never paid child support, as he was either caring for the child or

---

[4] SETHRA was not defined by any witness during trial. It appears that the acronym may refer to the Southeast Tennessee Human Resource Agency. *See* **In re Christopher S.**, No. E2012-02349-COA-R3-PT, 2013 WL 5436673, at \*11 (Tenn. Ct. App. Sept. 27, 2013) (discussing defining SETHRA as this entity in the context of transportation issues that the parents faced).

incarcerated for the majority of the child's life.

The parents' criminal records were at issue at trial. In October 2019, Mother was convicted of three charges: simple possession of methamphetamine; driving on a revoked license, and possession of drug paraphernalia. Mother was sentenced to thirty days incarceration with the remainder of her eleven-month, twenty-nine-day sentence on probation. Mother was also found guilty of theft under $1,000.00 in November 2019. Finally, it appears that Mother was once again convicted of driving on a revoked license in January 2020; she was sentenced to ten days incarceration with the remainder of her sentence on probation. Mother estimated that this was her eleventh charge of driving on a revoked license in her lifetime. Mother also admitted that she was arrested three or four times since the removal of the child.

Father also has an extensive criminal history. On September 21, 2017, Father was found guilty of simple possession and driving on a revoked license. Father also admitted that since the child was born he had been arrested for non-payment of child support with regard to an older child.[5] Most recently, August 23, 2018, he was driving on a revoked license with the child in the car when a police officer attempted to stop him in McMinn County. Rather than pull over, which he admitted could have resulted in only a ticket, he decided to evade the police going up to sixty-five miles per hour for a period of three to four minutes. Father was nevertheless arrested and was released on bond on August 31, 2018. Although the timeline is somewhat murky, it appears that Father was then incarcerated for a violation of probation in Bradley County related to the new charge. He remained incarcerated from January 2019 to July 16, 2019, when he was released back into the community. Father was eventually convicted of felony evading, relating to the police chase, on December 4, 2019. Because he was admittedly a career criminal, meaning at least six prior felony convictions, he was sentenced to six years in prison with some time to be served on probation/parole. His sentence began on October 9, 2019,[6] and he was released on parole on May 3, 2021. Father remains on parole until 2023.

The testimony also focused on parents' drug use. Both parents admitted that they had used drugs in the past. Mother claimed that her last drug use was three years prior to trial. Mother testified that she attends Narcotics Anonymous meetings once a week; no documentation of attendance was provided to DCS or the trial court. Mother also admitted that she never completed the alcohol and drug assessment required by the Permanency Plan; she testified that she had an appointment to do the assessment the week after trial and claimed that DCS failed to provide her with information to obtain one due to COVID-19. Mother also testified that DCS asked her to do two drug screens and that she consented to

---

[5] Father has two other children, one an adult. The minor child lives with an aunt. Mother has six other children. Two were adopted after DCS involvement. One lives with an aunt. It is unclear whether the child living with the aunt is shared by Mother and Father.

[6] It appears that Father began serving his sentence upon the guilty verdict in October 2019, but his sentence was not handed down until December 2019.

do them; but both times, she was unable to produce a urine sample. Ms. Walker testified that a DCS employee waited with Mother for hours to take the drug screening but she was always unable to produce a sample. Mother testified that she could pass a drug screen on the day of trial. Father also testified that his most recent drug use was years prior to trial, that he could pass a drug screen, and that he is drug screened as a condition of his parole; again, however, Father provided no proof of clean drug screens that were submitted as part of his parole requirements.

Visitation was also an issue. Father testified that he saw and parented the child essentially every day prior to his incarceration. Obviously, Father has not visited or had any contact with his son while he has been in prison, since October 2019. But he testified that even during the period of approximately sixty days between his incarceration in Bradley County and his most recent incarceration, he did not visit with this child in any manner. According to Father, he chose not to do so in an effort not to hurt the child because Father understood that his felony evasion charge would result in a long sentence. As a result, as of the date of trial, Father had no contact with this child since January 2019.[7]

Mother was permitted supervised visitation when she was not incarcerated. However, Mother did not consistently attend visitation. It does appear that the COVID-19 pandemic had some effect on the visitations. Still, Mother was offered twelve visitations in 2019; she attended three. In 2020, Mother attended seven of the thirty-six visitations offered. According to Foster Mother, there have been over ten times where Mother would confirm that she would attend visits, only not to show up. This leaves Foster Mother and the child waiting in the parking lot for the child for the fifteen minutes required by DCS to see if Mother arrives, while the child "cries for the whole 15 minutes."

Even when visitation did occur, it was not particularly productive. Mother attempted to interact with the child and take pictures of herself and the child. But the child sometimes did not interact with Mother, choosing to instead look at the window to where Foster Mother's car was waiting and call for her. Often, the visits were negative, though the extent of the negative effect on the child was somewhat unclear. Ms. Walker testified that after visitation, the child would exhibit anger, aggression, and "would sit still for hours or he would go sleep for hours at a time." She further testified that "[t]here's been several visitations where he has thrown up multiple times all day after a visitation with the biological mother." Foster Mother's testimony was more harrowing. According to her testimony, the child will "either throw up or have diarrhea or both after every single visitation." In addition, the child will cry and scream once he understands that a visit is about to take place. The child then tells Foster Mother "no go." For a time, visitation was at McDonald's; the child's negative reaction was so strong that he would react negatively

---

[7] And of course, there appear to have been other arrests that interrupted Father's contact with the child, including the child support arrest and the initial arrest related to the evasion. It is unclear how long Father was incarcerated as a result of these arrests.

to going to McDonald's regardless of whether it was for a visitation and Foster Mother would have to assure him that they were not there for visitation. As a result, DCS had recently moved the court to do therapeutic visitation shortly before the termination trial, but DCS made no attempt to terminate visitation.

The child's condition at the time of removal and thereafter was also at issue. Foster Mother testified that when the child was placed with her,

> [h]e was filthy when he came into my house. He came with only the clothes on his back. He had matted hair that was overgrown into his eyes. I noticed right away that at least two of his molars were very rotten. He had burns on the bottom of his feet that took two months to heal up.[8] That was his physical condition.

Because of how bad his teeth were, the child underwent oral surgery to combat a serious infection. Foster Mother also testified that the child's behavior at that time was "feral" with no boundaries or structure and that he exhibited his anger through hitting and scratching. But Foster Mother testified that the child has improved since he has been in her family's care. She explained that he now "has manners" and can visit places outside the home.

The child also experiences developmental delays. At the time the child was removed by DCS, the child did not understand how to play with toys; instead, he either attempted to smash the toy or use it to hurt someone else. Additionally, the child was completely non-verbal, so he resorted to screaming and screeching to communicate. Now, he is able to speak two-word sentences and is able to communicate better, but still struggles. The child therefore receives occupational therapy once a week, speech therapy once a week, and will be beginning in-home behavioral therapy. The child also sees quite a few doctors, including a neurologist and a developmental pediatrician with Vanderbilt. According to Foster Mother, the child probably has three or four appointments per month with a specialist on top of therapy visits, all of which require her to drive the child to his appointments, which are sometimes in other cities.

Foster Mother testified that the child is able to refer to her and her husband as "Mommy" and "Daddy." The child is very attached to both his foster parents and his three foster siblings, who are close to him in age. The foster siblings treat the child as a biological sibling. According to Foster Mother, the child has never exhibited any behavior to indicate that he misses either of his parents; to the extent that he even knows that Mother is his parent, however, Foster Mother testified his reaction is negative.

At the conclusion of trial, the trial court orally ruled that DCS met its burden as to

---

[8] Foster Mother testified that she was informed by DCS that the burns resulted from playing on hot concrete without shoes.

grounds and best interest with regard to both parents. The trial court entered a written order on June 24, 2021, finding that DCS had proven the following grounds: abandonment as to Father and failure to manifest a willingness and ability to assume custody or financial responsibility as to both parents. The trial court also ruled that termination was in the child's best interest. Both parents thereafter appealed to this Court.

## II. ISSUES PRESENTED

As we perceive it, this appeal involves two issues:

1. Whether the trial court erred in finding clear and convincing evidence of grounds to terminate Mother's and Father's parental rights?
2. Whether the trial court erred in finding clear and convincing evidence that termination was in the child's best interests?

## III. STANDARD OF REVIEW

Parental rights are "among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016) (collecting cases). Therefore, "parents are constitutionally entitled to fundamentally fair procedures in parental termination proceedings." *Id.* at 511. These procedures include "a heightened standard of proof—clear and convincing evidence." *Id.* at 522 (citations and quotations omitted). "Clear and convincing evidence is evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (quotation marks and citation omitted).

In Tennessee, termination of parental rights is governed by statute, which identifies "'situations in which [the] state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove by clear and convincing evidence (1) the existence of at least one of the statutory grounds in section 36-1-113(g), and (2) that termination is in the child's best interest. *See In re Valentine*, 79 S.W.3d at 546. "Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases." *In re Addalyne S.*, 556 S.W.3d 774, 782 (Tenn. Ct. App. 2018). The clear and convincing evidence standard applicable here is "more exacting than the 'preponderance of the evidence' standard, although it does not demand the certainty required by the 'beyond a reasonable doubt' standard. To be clear and convincing, the evidence must eliminate any substantial doubt and produce in the fact-

finder's mind a firm conviction as to the truth." ***In re S.R.C.***, 156 S.W.3d 26, 29 (Tenn. Ct. App. 2004) (internal citation omitted).

In termination cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *See* Tenn. R. App. P. 13(d); ***In re Carrington H.***, 483 S.W.3d at 523–24 (citations omitted). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." ***Id.*** at 524 (citation omitted).

## IV. ANALYSIS

## A. Grounds for Termination

Neither parent argues that the trial court erred in finding grounds to terminate their parental rights. We will nevertheless briefly address each of the grounds for termination found by the trial court. *See **In re Carrington H.***, 483 S.W.3d at 525–26 (holding that "in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal"). The grounds at issue in this appeal as to Father are therefore abandonment by an incarcerated parent through wanton disregard and failure to manifest an ability and willingness to assume legal and physical custody or financial responsibility for the child. Only the latter ground is at issue against Mother.

## 1. Abandonment

We begin with abandonment by an incarcerated parent through wanton disregard found against Father. Abandonment is one of several grounds for termination recognized by our legislature. See Tenn. Code Ann. § 36-1-113(g)(1). For purposes of this case, abandonment is defined as, inter alia,

> (iv) A parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, or a parent or guardian has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and has:
> * * *
> (*c*) Has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child . . . .

This Court has previously held that "probation violations, repeated incarceration, criminal

- 8 -

behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id.* at 867–68. In determining whether certain conduct constitutes wanton disregard, we have explained that "'a parent's criminal behavior does not automatically constitute wanton disregard for the welfare of a child,' but such behavior 'may constitute such wanton disregard under the appropriate circumstances.'" *In re Johnathan M.*, 591 S.W.3d 546, 555 (Tenn. Ct. App. 2019) (quoting *In re Kierra B.*, No. E2012-02539-COA-R3-PT, 2014 WL 118504, at *8 (Tenn. Ct. App. Jan. 14, 2014)). "When considering whether a parent's criminal conduct constitutes wanton disregard, we consider 'the severity and frequency of the criminal acts.'" *Id.* (quoting *In re Kierra B.*, 2014 WL 118504, at *8).

There is no dispute that Father was incarcerated for the entirety of the four months preceding the filing of the termination petition. The question then is whether Father exhibited behavior prior to this incarceration that exhibited a wanton disregard for the child's welfare. We conclude that DCS presented clear and convincing evidence to support this ground for termination. Here, Father's incarceration at the time of the petition was the result of his decision to engage in criminal conduct by evading police while both on probation and while driving on a revoked license. Father admitted that had he pulled over when instructed to by police, he likely would have received only a simple ticket. Instead, Father's choice to evade not only put the child's life in danger, as he was in the car with father during the police chase, but also resulted in the removal of Father from the child's life for half of the child's life due to Father's status as a career criminal.

While Father appeared to insist at trial that this was the only criminal activity he engaged in during the child's life, we cannot agree. For one, it appears that Father was convicted of a second driving on a revoked license charge and a simple possession of a schedule II drug on September 21, 2017, well after the child's birth. While these convictions did not result in jail time, Father agreed that he had been "put in jail . . . since the child was born for failure to pay child support" on an older child. Thus, it appears that Father was both convicted of several crimes and incarcerated prior to his criminal activity that initiated this case. Moreover, Father admitted that even though there was a period of approximately sixty days where he was not incarcerated prior to the filing of the petition, he voluntarily chose not to see the child because he knew that he would soon be back in prison. While Father may have been correct that such visits may have been difficult for the child given Father's impending incarceration, it cannot be ignored that it was Father's own choice to engage in criminal conduct that created such an untenable situation in the first place. Under these circumstances, the trial court did not err in finding sufficient evidence to sustain this ground for termination.

## 2. Willingness and Ability

DCS next contends that both parents failed to manifest a willingness and ability, whether by act or omission, to personally assume legal and physical custody or financial responsibility of the children and that placing the children in their legal and physical custody would create a risk of substantial harm to the children's physical or psychological welfare. Tenn. Code Ann. § 36-1-113(g)(14). Essentially, the statutory ground has two distinct elements which must be proven by clear and convincing evidence:

> First, DCS must prove that [the parent] failed to manifest 'an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren].' DCS must then prove that placing the children in [the parent's] 'legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren].'

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018) (quoting Tenn. Code Ann. § 36-1-113(g)(14)). As for the first element, the petitioner must "prove[ ] by clear and convincing proof that a parent or guardian has failed to manifest <u>either</u> [an] ability or willingness" to parent the child. *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020).

The proof shows that neither parent is able to take physical custody of the child either at the time the petition was filed or at the time of trial. While Mother had finally secured a proper home in the months before the termination trial, the proof showed that she failed to ever produce any clean drug screen for DCS, failed to make substantial progress on the steps in her permanency plan, failed to provide DCS with the mental health assessment that she took, and continued to be arrested after the child was removed. Importantly, due to her lack of driver's license or transportation plan, Mother is also unable to take the child to the necessary appointments that he attends multiple times a month. Mother's lack of license is particularly troubling. While Mother claimed at trial that she was close to obtaining a license, we conclude that this claim lacks credibility; by the time of trial, thirty-two months had passed from the initial removal and twenty-three months had passed since the child had been placed in foster care. Moreover, she admitted to having been arrested ten to eleven times for this charge and that her license had been revoked years ago. Even with the termination of her parental rights on the horizon, Mother had still simply not made progress on this goal, regardless of whether a portion of her lack of progress was due to issues outside her control. And without transportation to take the child to his necessary appointments, Mother cannot be characterized as solidly capable of meeting the child's needs. Together with the other issues noted above, Mother is therefore simply not able to personally assume physical custody of the child.

Turning to Father, at the time the petition was filed, Father was incarcerated on his seventh felony charge. *See In re Serenity W.*, No. E2018-00460-COA-R3-PT, 2019 WL 511387, at *7 (Tenn. Ct. App. Feb. 8, 2019) (citing *In re M.E.N.J.*, No. E2017-01074-COA-R3-PT, 2017 WL 6603658, at *7 (Tenn. Ct. App. Dec. 27, 2017)) (noting that a

parent's ability is generally measured as of the time the petition is filed). This situation is therefore "similar to several other cases in which this Court has determined that a parent's incarceration and criminal history constituted clear and convincing evidence that the parent had failed to manifest an ability to assume custody." *In re Elijah H.*, No. M2020-01548-COA-R3-PT, 2021 WL 4593844, at *12 (Tenn. Ct. App. Oct. 6, 2021), *perm. app. denied* (Tenn. Dec. 29, 2021) (distinguishing *In re Ahleigha C.*, No. E2020-01683-COA-R3-PT, 2021 WL 3401021, at *8 (Tenn. Ct. App. Aug. 4, 2021) (McGee, J., dissenting) (holding, in a split opinion, that a single instance of criminal conduct that resulted in incarceration was insufficient to show an inability to parent); *In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *8 (Tenn. Ct. App. Apr. 23, 2020), *perm. app, denied* (Tenn. Dec. 10, 2020); *In re Eli S.*, No. M2019-00974-COA-R3-PT, 2020 WL 1814895, at *8 (Tenn. Ct. App. Apr. 9, 2020); *In re O.M.*, No. E2018-01463-COA-R3-PT, 2019 WL 1872511, at *4 (Tenn. Ct. App. Apr. 26, 2019); *In re Ke'Andre C.*, No. M2017-01361-COA-R3-PT, 2018 WL 587966, at *11 (Tenn. Ct. App. Jan. 29, 2018)).

And while Father was not incarcerated at the time of the termination trial, the proof shows that Father was still not equipped to care for the child at that time. According to Father, he is living with his mother, who had previously had physical custody of the child until it was determined that she was violating the court's orders. Moreover, Father had no steady employment, but was instead working odd jobs without documentation. Father also likely had no driver's license, given that his evasion was the result of driving on a revoked license and his prior conviction for a second driving on revoked license charge. And again, transporting the child to his necessary appointments is incredibly important in this case. Moreover, Father candidly admitted that it would take him at least four months to be stable enough for the child to return to his care. As a result, we agree with the trial court that Father is unable to take physical custody of the child.

We therefore proceed to consider whether DCS presented clear and convincing evidence sufficient to satisfy the second prong of the statute—that placing the child in Mother's or Father's legal and physical custody would create a risk of substantial harm to his physical or psychological welfare. Tenn. Code Ann. § 36-1-113(g)(14). With regard to substantial harm, this Court stated that:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

- 11 -

*In re Maya R.*, 2018 WL 1629930, at \*7 (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted)).

Although we conclude that substantial harm is present as to both Mother and Father, the harm demonstrated by DCS is different as to each parent. Here, the evidence shows that contact with Mother is profoundly negative for the child. According to the DCS caseworker, the child would experience anger and physical symptoms after some of the visitations with Mother. But according to Foster Mother, the child had more recently been exhibiting physical symptoms of extreme distress following each and every visitation with Mother. The effect is so bad that the child began to associate the place where visitation took place with the negative feelings he associated with visitation. The trial court specifically credited the testimony of Foster Mother as to the child's reaction to recent visits. Nothing in the record or Mother's appellate brief leads us to overturn that explicit credibility finding. *See In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (quoting *Galbreath v. Harris*, 811 S.W.2d 88, 91 (Tenn. Ct. App. 1990) (noting that when "an issue which hinges on the credibility of witnesses, the trial court will not be reversed unless there is found in the record clear, concrete, and convincing evidence other than the oral testimony of witnesses which contradict the trial court's findings")).Thus, DCS presented a surfeit of proof that returning the child to Mother's care will likely cause him extreme emotional distress.

It is true that the proof did not show any such negative reaction to Father. But that is because the child has had no opportunity to interact with Father in anyway in nearly two and one-half years. The reason that Father has been so far removed from the child's life is because of his own choice to engage in criminal activity on more than one occasion since the child's birth. And even when Father could visit the child while he was awaiting sentencing on his most recent felony, he chose not to. Thus, it is Father's choices that have made him a stranger to the child. And Father himself admitted that the child would be emotionally harmed if he was removed from the foster family to whom he is clearly bonded and placed in his custody. We therefore agree with the trial court that placing the child with Father at this juncture amounts to substantial harm. *See generally In re Elijah H.*, 2021 WL 4593844, at \*11 ("This Court has previously determined that removing a child who has 'bonded and thrived' with his current family and placing a child in the custody of a near-stranger would amount to substantial harm."); *In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at \*17 (Tenn. Ct. App. July 22, 2020), *perm. app. denied* (Tenn. Dec. 10, 2020) (determining that the child would be at risk of substantial psychological harm if custody were restored to the father who had been apart from the child for five years and was a "virtual stranger."); *In re Antonio J.*, No. M2019-00255-COA-R3-PT, 2019 WL 6312951, at \*9 (Tenn. Ct. App. Nov. 25, 2019) (concluding that placing the children in the mother's custody would put them at risk of substantial harm because the children were "very young" when they were removed and had "little to no contact" with the mother for more than a year).

- 12 -

Finally, there is one fault that both parents share: neither appears to have any safe and legal method of transportation, given that both have an obvious penchant for driving without valid licenses. But the proof at trial was that the child visits multiple doctors and therapists each month that Foster Mother is required to drive the child to. If the child were returned to Mother and Father, who lack valid driver's licenses and no clear transportation plan even around two years following removal, it is unclear how they would be able to meet the serious medical needs of the child. On the whole, we therefore agree that there is a likelihood of substantial harm should the child be returned to their care.

### B. Best Interest

Because we have determined that at least one statutory ground has been proven for terminating Mother's parental rights, we must now decide if DCS has proven, by clear and convincing evidence, that termination of Mother's rights is in the children's best interests. Tenn. Code Ann. § 36-1-113(c)(2); *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). If "the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child." *In re Navada N.*, 498 S.W.3d at 607.

The statutory factors that courts should consider in ascertaining the best interest of the children include, but are not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

- 13 -

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).[9] "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005) (citations omitted).

Both parents take issue with the trial court's findings as to factors (1) and (2), which findings they argue are unclear, contradictory, and insufficient. Specifically, with regard to factor (2), the trial court found as follows:

61. As to the second statutory factor, the Court does not know if the parents have made lasting adjustments after reasonable efforts. [Father] has made the adjustment in that he is no longer in jail, but he has not been out of jail long, and certainly not long enough to say it is a lasting adjustment. [Mother] has not made lasting changes since the child entered [DCS] custody. A lasting adjustment does not seem reasonable possible.
62. [DCS] made reasonable efforts, despite Covid-19 and in spite of their limitations to provide social services, especially as to [Mother].
63. The second statutory best interest factor favors termination.

Parents essentially assert that the trial court's findings indicate that insufficient evidence was presented by DCS to indicate whether the parents' adjustments will be lasting. And they argue that a lack of proof on this issue means that these factors should weigh against termination. *See, e.g., In re Jayda J.*, No. M2020-01309-COA-R3-PT, 2021 WL 3076770, at *28 (Tenn. Ct. App. July 21, 2021) (holding that because no evidence was presented as

---

[9] This is the version of section 36-1-113(i) that was in effect when the termination petition was filed. The Tennessee General Assembly amended the statutory best interest factors in 2021. *See* 2021 Tenn. Laws Pub. Ch. 190 (S.B. 205), eff. April 22, 2021. No party asserts that the revised version of the statute is applicable in this case.

- 14 -

to a factor, the factor weighed against termination); *In re Taylor B.W.*, 397 S.W.3d 105, 113 (Tenn. 2013) (affirming the trial court's holding that the absence of proof as to a factor meant the factor did not favor termination); *In re Malachi M.*, No. E2020-00561-COA-R3-PT, 2020 WL 6819195, at *9 (Tenn. Ct. App. Nov. 20, 2020) (holding that the lack of evidence to a factor meant the factor "weigh[ed] against terminating Father's parental rights").

While we agree that the trial court's findings are difficult to discern, our review of the record reveals ample proof that parents have not made a lasting adjustment of circumstances, despite DCS support, that would allow the child to be returned to their homes. As for Mother, the proof presented by DCS showed that DCS worked with Mother by explaining the Criteria for Termination, facilitating visitation, providing drug screens, and helping Mother set up other services to help with her mental health and transportation issues. Despite this help, the proof at trial was that Mother never participated in a requested drug and alcohol assessment, never provided a sample from which a drug screen could be conducted, had never provided proof to DCS of the results of her mental health screening or that she was undergoing mental health treatment, despite her mental health diagnoses, and had never provided DCS with a transportation plan for the child or demonstrated that she was capable of consistently taking the child to his various appointments. With regard to each task that she admitted she did not complete, Mother attributed her failure to someone else's neglect. But she also testified that she would miraculously be able to complete some of these tasks immediately following trial. As a result, it does not appear that the trial court credited Mother's excuses in many instances.[10] And these issues prevent the child from being safely reintegrated into Mother's home. Thus, despite the reasonable efforts of DCS, Mother had not made a lasting adjustment of circumstances and appeared unlikely to be able to do so by the time of trial.

Although DCS did less for Father, we nevertheless conclude that its efforts were reasonable under the circumstances. Importantly, DCS's efforts are reasonable so long as their efforts are equal to or eclipse the efforts of the parents. *See In re Rahjada W.*, No. E2019-01798-COA-R3-PT, 2020 WL 2893434, at *5 (Tenn. Ct. App. June 3, 2020) (citing Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c)) ("DCS will be found to have made 'reasonable efforts' if its actions are equal to or greater than the parent's."). At trial, Father took issue with the fact that DCS did not visit Father in prison. Instead, he claimed that he always contacted DCS.[11] It is unclear, however, how that would have helped Father accomplish any of the goals in his permanency plan, as he also claimed at trial that he was unable to do any of the tasks required because of his incarceration. Moreover, Father essentially admitted that for a time while he was not imprisoned, he chose not to contact

---

[10] As discussed below, the trial court did appear to credit Mother's testimony that visitation was thwarted due to the COVID-19 pandemic.

[11] Ms. Walker testified that she often could not contact Father telephonically due to jail policies, as calls had to be initiated by him. According to Ms. Walker, Father called her three times, while she called him once.

DCS or his son. Thus, we conclude that DCS's efforts were reasonable under the circumstances of this case.

Moreover, the proof presented at trial leads us to share the trial court's concern that any positive adjustments Father has made may not be lasting. To be sure, Father has recently been released from incarceration. But other than that, Father has made little concrete positive steps that indicate he is able to care for his child. For example, while Father claimed that he could take a drug class while incarcerated, he failed to provide DCS proof that he had participated in such a class by the time of trial. And while we tend to credit Father's assertion that he is currently drug free, he again failed to provide DCS with any proof of that fact, despite the Permanency Plan requesting such proof. Father's assertion that he will now refrain from criminal activity also rings somewhat hollow. The proof shows that Father had only been released from prison a month prior to trial, that he has a lengthy criminal history, and that at least one child had previously been removed from his custody. Thus, even the removal of two children from his care has not prompted Father to refrain from engaging in criminal activity so that he could care for his children. The fact that Father has not incurred new charges in the month that he has been released, while laudable, sheds little light on his ability to do so in the future. As such, the trial court was correct in its assessment that at this juncture, Father's adjustment of circumstances may not be lasting. Consequently, while this factor weighs less heavily than with Mother, we still conclude that clear and convincing evidence was presented to show that these factors weigh in favor of termination as to Father.

We must disagree, however, with the trial court's conclusion that factor (3) does not favor termination. Instead, we conclude that factors (3), (4), and (5) heavily favor termination. Here, the trial court appears to have found that Mother's lack of visitation was the result of the COVID-19 pandemic. While we agree that the pandemic presented some challenges, the evidence shows that Mother was actually offered a total of thirty-six visitations in 2020; she attended seven. And during a period in 2019 in which Mother was offered twelve visits, she attended only three. Moreover, as previously discussed, the visits that Mother did attend were often negative for the child. As a result, it cannot be said that Mother has any meaningful relationship with the child. And given the child's bond with his foster family, and his clear lack of bond toward Mother, a change in caretakers would be detrimental to the child.

It is undisputed that Father and the child have had no visitation of any kind in over two years. The trial court apparently found that Father's failure to visit was excused by his incarceration. In determining a child's best interest, however, we have noted that "[f]rom the child's point of view, the reasons for the lack of interaction matter little." *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004); *see also In re Lydia N.-S.*, No. M2016-00964-COA-R3-PT, 2017 WL 420344, at *10 (Tenn. Ct. App. Jan. 31, 2017) (holding that a father's lack of visitation weighed in favor of termination where the evidence demonstrated that his "failure was due in substantial part to his poor choices and

- 16 -

criminal conduct"). Moreover, this is not the case where a parent has made every effort to maintain a relationship, such as through other means of communication. Although the child here is somewhat nonverbal, the proof shows that Father made little effort to maintain contact with the child, either in the months preceding or during his incarceration; Ms. Walker testified that Father never even asked about the child's well-being when he spoke to her, and Father admitted that he voluntarily chose not to see his son in the two months prior to his incarceration. In addition, Foster Mother testified that the child never asks about Father in any manner. Indeed, Father admitted that it would be difficult for the child to be placed in his custody. As a result, it does not appear that Father has a meaningful relationship with the child. Thus, even without the extreme negative reaction that is present when the child is forced to visit Mother, we still must conclude that removing the child from a foster family to which he is strongly bonded in favor of a parent who is a virtual stranger would be detrimental to the child, as Father himself admitted at trial. These factors therefore highly favor termination as to Father.

The trial court also found that factor (6), regarding abuse and neglect, favored termination. Once again, the trial court's findings are lacking, as the trial court cites nothing more in support of its finding than the fact that the child was adjudicated dependent and neglected. Still, we conclude that DCS presented sufficient evidence as to this factor. First, when the child was placed in DCS's physical custody, he was filthy, with matted hair and serious dental issues. Although Mother at this time was prohibited from having physical custody of the child unsupervised, the evidence shows that she was keeping the child, unsupervised, in violation of the court's order. As such, the evidence demonstrated that Mother neglected the child's hygiene and dental health. As for Father, the removal of the child in 2018 occurred when he placed the child in danger by engaging in a high-speed chase with law enforcement simply to avoid the consequences of his own actions. Thus, the trial court was correct to find that Father neglected the child's welfare.

The trial court found that factor (7), related to the parents' homes, was neutral. DCS disputes this finding on appeal. As to Mother, DCS cites her history of drug use, her failure to be drug screened, her refusal to participate in a drug and alcohol assessment, her extensive criminal history, and the fact that she only obtained housing right before trial. As to Father, DCS cites his criminal history and his prior drug use. It is true that the physical environments of both parents' homes appear to be proper. The proof shows, however, that there are concerns in each home related to drug use and criminal activity. Given the facts both in favor of termination on this factor, and against, we cannot conclude that the evidence preponderates against the trial court's findings as to this factor.

The trial court also found factor (8) concerning mental health neutral. Neither DCS nor Father appears to dispute this finding as to Father, but DCS asserts that this factor favors termination as to Mother. Here, Mother admitted that she had been diagnosed with various mental disorders, but stated that she was not prescribed medication to combat those issues. DCS could not evaluate this claim, however, as Mother never provided DCS with

the recommendations from her mental health assessment. On the whole, given the dearth of proof on this issue, we cannot conclude that the evidence preponderates against the trial court's finding that this factor is generally neutral as to Mother.

Finally, the trial court found that factor (9) regarding support favored termination, which neither Mother nor Father dispute. Thus, it appears that as to both parents, eight factors favor termination, while two factors do not. But we do not determine the best interest of a child merely by totaling the number of factors that weigh for or against termination; instead, that determination often depends on the relevancy and weight of each factor. *See In re I.E.A.*, 511 S.W.3d 507, 518 (Tenn. Ct. App. 2016) (quoting *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)).

Here, from the child's perspective, we must conclude that the most important factors are the lack of meaningful relationship between the child and his parents and the detrimental effect that a change in caretakers would cause. *See In re Addalyne S.*, 556 S.W.3d 774, 795–96 (Tenn. Ct. App. 2018) ("This Court has previously indicated that in some cases the lack of a meaningful relationship between a parent and child is the most important factor[.]") (citing *In re Jayvien O.*, No. W2015-02268-COA-R3-PT, 2016 WL 3268683, at *9 (Tenn. Ct. App. June 7, 2016) (affirming the trial court's decision where it found the lack of meaningful relationship the "most important[ ]" factor); *In re Terry S.C.*, No. M2013-02381-COA-R3-PT, 2014 WL 3808911, at *18 (Tenn. Ct. App. July 31, 2014) ("[P]erhaps most importantly, [the mother] has failed to maintain regular visitation with the children and therefore has no meaningful relationship with them")). In this case, visitation between the parents and the child is either non-existent or negative. Coupled with the child's developmental challenges, it simply cannot be argued that the child has any meaningful relationship with either Mother or Father. But the child does have a family that he is bonded to: the foster family. This family understands the challenges that the child may face and the work that is required to meet those challenges, and has the desire to adopt the child permanently into their family. In foster family's embrace, the child's needs have been met and he has been making improvements. In contrast, neither Mother nor Father have ever been able to demonstrate any stability of the kind that would be necessary to parent their child despite extensive involvement with DCS over the years. The evidence is therefore clear and convincing that termination of both Mother's and Father's parental rights serves the child's best interests.

## V. CONCLUSION

The judgement of the Bradley County Circuit Court is affirmed, and this cause is remanded to the trial court for all further proceedings as are necessary and consistent with this Opinion. Costs of this appeal are taxed one-half to Appellant, Debbie D., and one-half to Appellant Paul K., for which execution may issue if necessary.

_s_/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE